54 U.S. 518 (____)
13 How. 518
THE STATE OF PENNSYLVANIA, COMPLAINANT,
v.
THE WHEELING AND BELMONT BRIDGE COMPANY, WILLIAM OTTERSON AND GEORGE CROFT.
Supreme Court of United States.

*522 The following extract contains the views of Mr. Stanton, one of the counsel for the complainant.
*557 Mr. Justice McLEAN delivered the opinion of the court.
This bill was filed in the clerk's office of this court, in July, 1849. It charged that the defendants, under color of an act of the Legislature of Virginia, but in direct violation of its terms, were engaged in the construction of a bridge across the Ohio River, at Wheeling, which would obstruct its navigation, to and from the ports of Pennsylvania, by steamboats and other craft which navigate the same. That the State of Pennsylvania owns certain valuable public works, canals, and railways, constructed at great expense as channels of commerce, for the transportation of passengers and goods, from which a large revenue, as tolls, was received by the State. That these works terminate on the Ohio River, and were constructed with direct reference to its free navigation; the goods and passengers transported on these lines were conveyed in steamboats, on the Ohio River; and the Wheeling Bridge would so obstruct the navigation of that river, as to cut off and direct trade and business from the public works of Pennsylvania, impair and diminish the tolls and revenue of the State, and render its improvements useless. The bill prayed an injunction against the erection of the bridge, as a public nuisance, and for general relief.
In August, 1849, a supplemental bill was filed, stating that, after notice, the defendants continued to prosecute their work, and were engaged in stretching iron cables across the channel of the river, which would obstruct its navigation, and it praved that these cables might be abated.
At the December term of this court, 1849, another supplemental bill was filed, representing that defendants had completed the erection of the bridge, and that it had obstructed the passage of steamboats carrying freight and passengers to and from the ports of Pennsylvania; that it also hindered the passage of steam-ships and sea-going vessels, which were accustomed to be constructed at the ports of Pennsylvania, and would injure and destroy the trade and business of ship and boat building, which was carried on by the citizens of Pittsburg, and it prayed an abatement of the bridge as a public nuisance, and for general relief.
In their answers the defendants allege the exclusive sovereignty *558 of Virginia over the Ohio River, and set forth the act authorizing the erection of the bridge. And they object to the application for an injunction and the relief prayed for, that the persons injured might have remedy in the courts of Virginia; that the State of Pennsylvania had no corporate capacity to institute this suit in the Supreme Court, to vindicate the rights of her citizens; that the State is only a nominal party, whose name was, without proper authority, used by individuals; that the bridge is a connecting link of a great public highway, as important as the navigation of the Ohio River; that Pennsylvania had set the example of authorizing bridges across the Ohio; that certain engineers of the United States had recommended a wire suspension-bridge at Wheeling, and gave as their opinion, that "by an elevation of ninety feet, every imaginable danger of obstructing the navigation would be avoided;" that certain reports of committees in Congress recognized the necessity of a bridge at Wheeling, and recommended an appropriation for that purpose; that the headway for steamers left by the bridge is amply sufficient, forty-seven feet above the water, for all useful purposes; and if sufficient draught cannot be had at that height, blowers might be added; that chimneys might have hinges on them, so as to be lowered without much inconvenience; that the bridge will not be an appreciable inconvenience to the average class of boats; that the bridge will not diminish or destroy trade between Pittsburg and other ports, or do irreparable injury to the citizens of Pennsylvania.
The answer admits that the State of Pennsylvania has expended large sums of money in the construction of public improvements, terminating at Pittsburg and Beaver; that a great amount of freight and a large number of passengers do pass over said works, and that a large amount of toll to the State is derived therefrom; that the navigation of the Ohio River is important to the works above referred to, and that the value thereof would be affected injuriously if from any cause the passage of steamboats from the city of Pittsburg downwards were obstructed or impeded. But they deny that their bridge or the cables will have any such effect, or that it can in truth be called a nuisance.
To the actual obstruction occasioned by the bridge, as charged in the second supplemental bill, they set up an amendatory and explanatory act of the Virginia Legislature, passed 11th of January, 1850, declaring the height of ninety feet at the eastern abutment, ninety-three and a half feet at the highest point, and sixty-two feet at the western abutment, above the low-water level of the Ohio River, to be of lawful height, and in conformity with the intent and meaning of the 19th section of the charter.
*559 At December term, 1849, the question of jurisdiction was argued on both sides, and it was sustained by the entry of an order of reference to the Hon. R.H. Walworth, as special commissioner to take testimony and report 
1. Whether the bridge is, or is not, an obstruction of the free navigation of the Ohio River, by vessels propelled by steam or sails, engaged, or which may be engaged, in the commerce or navigation of said river.
2. If an obstruction be made to appear, what change or alteration in the construction and existing condition of the said bridge, if any, can be made, consistent with the continuance of the same across said river, that will remove the obstruction to the free navigation.
At the ensuing term, near its close, the commissioner made his report, together with the report of the engineer employed, and the evidence taken before him, deciding,
1. That the bridge is not an obstruction to the free navigation of the Ohio by any vessels propelled by sails.
2. That the bridge is an obstruction of the free navigation of the Ohio by vessels propelled by steam.
3. That the change or alteration which can and should be made in the construction and existing condition of the bridge is, to raise the cables and flooring in such manner as to give a level headway, at least three hundred feet wide, over a convenient part of the channel, of not less than one hundred and twenty feet above the level of zero on the Wheeling water-gauge.
To this report several exceptions were taken, by the counsel on both sides.
As this is the exercise of original jurisdiction by this court, on the ground that the State of Pennsylvania is a party, it is important to ascertain whether such a case is made out as to entitle the State to assume this attitude. In the second section of the third article of the Constitution, it is declared that the Supreme Court shall have original jurisdiction in a case, where a State shall be a party.
In this case the State of Pennsylvania is not a party in virtue of its sovereignty. It does not come here to protect the rights of its citizens. The sovereign powers of a State are adequate to the protection of its own citizens, and no other jurisdiction can be exercised over them, or in their behalf, except in a few specified cases. Nor can the State prosecute this suit on the ground of any remote or contingent interest in itself. It assumes and claims, not an abstract right, but a direct interest in the controversy, and that the power of this court, can redress its wrongs and save it from irreparable injury. If such a case be made out, the jurisdiction may be sustained.
*560 When a State enters into a copartnership, or becomes a stockholder in a bank, or other corporation, its sovereignty is not involved in the business, but it stands and is treated as other stockholders, or partners. And so in the present case, the rights asserted and relief prayed, are considered as in no respect different from those of an individual. From the dignity of the State, the Constitution gives to it the right to bring an original suit in this court. And this is the only privilege, if the right be established, which the State of Pennsylvania can claim in the present case.
It is objected, in the first place, that there is no evidence that the State of Pennsylvania, has consented to the prosecution of this suit in its own name.
This would seem to be answered by the fact, that the proceedings were instituted by the attorney-general of the State. He is its legal representative, and the court cannot presume, without proof, against his authority. In January, 1850, the following declaration passed unanimously by both branches of the Pennsylvania Legislature: "Whereas the navigation of the River Ohio has been, and is now obstructed by bridges erected across its channel, between Zane's Island and the main Virginia and Ohio shores, so that steamboats and other water crafts hitherto accustomed to navigate said river, are hindered in their passage to and from the port of Pittsburg, and other ports in the State of Pennsylvania, and the trade and commerce, and business of this Commonwealth interrupted, the revenue of her public works diminished and impaired, and steamboats, owned and navigated by citizens of this State, bound to and from her ports, are subjected to labor, expense, and delay, with hazard to life and property, by reason whereof the said bridges are a common and public nuisance, injurious to the State of Pennsylvania and her citizens, therefore be it resolved, &c.
"2. That the proceedings, in behalf of said State, instituted by her attorney-general in the Supreme Court of the United States, and now pending therein against the Wheeling and Belmont Bridge Company to abate the nuisance occasioned by their bridge lately erected across the Ohio, be prosecuted to final judgment, decree, and execution, for abatement of said nuisance."
On a question of disputed boundary between two States, although the inquiry of the court is limited to the establishment of a common line, yet the exercise of sovereign authority, over more or less territory, may depend upon the decision. This gives great dignity and importance to such a controversy, and renders necessary a broader view, than on a question as to the mere right of property. But in the present case, the State of *561 Pennsylvania claims nothing connected with the exercise of its sovereignty. It asks from the court a protection of its property, on the same ground and to the same extent as a corporation or individual may ask it. And it becomes an important question whether such facts are shown, as to require the extraordinary interposition of this court.
Relief in this form is given, as it cannot be given adequately in any other. The injury complained of, in the language of the books, must be irreparable by a suit at law for damages. It is matter of history, as well as in proof, that Pennsylvania, for many years past, has been engaged in making extensive improvements by canals, railroads, and turnpikes, many of them extending from Eastern Pennsylvania to Pittsburgh, by which the transportation of goods and passengers is greatly facilitated, and that a large portion of the goods and passengers thus transported are conveyed to and from Pittsburg on the Ohio River.
On the 18th of December, 1789, an act was passed by Virginia, consenting to the erection of the State of Kentucky out of its territory, on certain conditions, among which are the following: "That the use and navigation of the River Ohio, so far as the territory of the proposed State, or the territory that shall remain within the limits of this Commonwealth lies thereon, shall be free and common to the citizens of the United States." Virg. Revised Code, 1819, p. 19. To this act the assent of Congress was given. 1 Stat. at Large, 189.
That the Ohio River is navigable, is a historical fact, which all courts may recognize. For many years the commerce upon it has been regulated by Congress, under the commercial power, by establishing ports, requiring vessels which navigate it to take out licenses, and to observe certain rules for the safety of their passengers and cargoes. Appropriations by Congress have been frequently made, to remove obstructions to navigation from its channel.
It appears that Pennsylvania has constructed a combined line of canal and railroad from Pittsburgh and Alleghany cities, to the city of Philadelphia, a distance of about four hundred miles, at an expense of about sixteen millions of dollars, all of which are owned by the State. There is also a railroad from Pittsburgh to Harrisburg which will soon be completed, at an expense of some eight or ten millions of dollars. There is also a slack-water navigation from Pittsburgh to Brownsville, and up the Yaughegany to West Newton, and there are other lines of communication between Pittsburg and the East, which are owned in whole or in part by the State, and from which it derives revenue.
And the witnesses generally say, that any obstruction on the Ohio River, to the free passage of steamboats, must affect injuriously *562 the revenue from the above public works, as it would divert the transportation of goods and passengers from the lines to and from Pittsburg, to the northern lines through New York. Whilst the witnesses differ as to the amount of such an injury, they generally agree in saying, that any serious obstruction on the Ohio would diminish the trade and lessen the revenue of the State. The value of the goods to and from Pittsburg, transported on the above lines of communication, is estimated at from forty to fifty millions annually. And it is shown that the commerce on the Ohio, to and from Pittsburg, amounts to about the same sum.
If the bridge be such an obstruction to the navigation of the Ohio as to change, to any considerable extent, the line of transportation through Pennsylvania to the northern route through New York, or to a more southern route, an injury is done to the State of Pennsylvania, as the principal proprietor of the lines of communication, by canal and railroad, from Philadelphia to Pittsburg. And this injury is of a character for which an action at law could afford no adequate redress. It is of daily occurrence, and would require numerous, if not daily prosecutions, for the wrong done; and from the nature of that wrong, the compensation could not be measured or ascertained with any degree of precision. The effect would be, if not to reduce the tolls on these lines of transportation, to prevent their increase with the increasing business of the country.
If the obstruction complained of be an injury, it would be difficult to state a stronger case for the extraordinary interposition of a court of chancery. In no case could a remedy be more hopeless by an action at common law. The structure complained of is permanent, and so are the public works sought to be protected. The injury, if there be one, is as permanent as the work from which it proceeds, and as are the works affected by it. And whatever injury there may now be, will become greater in proportion to the increase of population and the commercial developments of the country. And in a country like this, where there would seem to be no limit to its progress, the injury complained of would be far greater in its effects than under less prosperous circumstances.
As we are now considering the obstruction of the bridge, not as to the relief prayed for, but as to the form of the remedy adopted by the complainant, we are brought to the conclusion, as before announced by this court to the parties, that there is made out a primâ facie case for the exercise of jurisdiction. The witnesses who testify to the obstruction are numerous, and the weight of their testimony is not impaired by the impeachment of their credit, or a denial of the facts stated by them.
*563 But it is objected, if not as a matter going to the jurisdiction, as fatal to any further action in the case, that there are no statutory provisions to guide the court, either by the State of Virginia, or by Congress. It is said that there is no common law of the Union on which the procedure can be founded; that the common law of Virginia is subject to its legislative action, and that the bridge, having been constructed under its authority, it can in no sense be considered a nuisance. That whatever shall be done within the limits of a State, is subject to its laws, written or unwritten, unless it be a violation of the Constitution, or of some act of Congress.
It is admitted that the federal courts have no jurisdiction of common-law offences, and that there is no abstract pervading principle of the common law of the Union under which we can take jurisdiction. And it is admitted, that the case under consideration, is subject to the same rules of action as if the suit had been commenced in the Circuit Court for the District of Virginia.
In the second section of the third article of the Constitution it is declared, "the judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made under their authority."
Chancery jurisdiction is conferred on the courts of the United States with the limitation "that suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate, and complete remedy may be had at law." The rules of the High Court of Chancery of England have been adopted by the courts of the United States. And there is no other limitation to the exercise of a chancery jurisdiction by these courts, except the value of the matter in controversy, the residence or character of the parties, or a claim which arises under a law of the United States, and which has been decided against in a State court.
In exercising this jurisdiction, the courts of the Union are not limited by the chancery system adopted by any State, and they exercise their functions in a State where no court of chancery has been established. The usages of the High Court of Chancery in England, whenever the jurisdiction is exercised, govern the proceedings. This may be said to be the common law of chancery, and since the organization of the government, it has been observed.
In Robinson v. Campbell, (3 Wheat. 222,) it is said, "The court, therefore, think that, to effectuate the purposes of the legislature, the remedies in the courts of the United States are to be, at common law or in equity, not according to the practice *564 of State courts, but according to the principles of common law and equity, as distinguished and defined in that country from which we derive our knowledge of those principles."
This principle is not controverted by what is laid down in the case of Wheaton & Donaldson v. Peters, 8 Pet. 658. In that case, the court say, "It is clear there can be no common law of the United States. The federal government is composed of twenty-four sovereign and independent States, each of which may have its local usages, customs, and common law. There is no principle which pervades the Union, and has the authority of law, that is not embodied in the Constitution or laws of the Union. The common law could be made a part of our federal system only by legislative adoption. When, therefore, a common-law right is asserted, we must look to the State in which the controversy originated." The inquiry, in that case, was, whether a copy-right existed by common law in the State of Pennsylvania. But, in the case above cited from 3 Wheaton, the court spoke of the remedy. By the act of Congress of 1828, proceedings at law, in the courts of the United States, are required to conform to the modes of proceeding in the State courts; but there is no such provision in regard to courts of chancery.
Under this system, where relief can be given by the English chancery, similar relief may be given by the courts of the Union.
An indictment at common law could not be sustained in the federal courts by the United States, against the bridge as a nuisance, as no such procedure has been authorized by Congress. But a proceeding, on the ground of a private and an irreparable injury, may be sustained against it by an individual or a corporation. Such a proceeding is common to the federal courts, and also to the courts of the State. The injury makes the obstruction a private nuisance to the injured party; and the doctrine of nuisance applies to the case where the jurisdiction is made out, the same as in a public prosecution. If the obstruction be unlawful, and the injury irreparable, by a suit at common law, the injured party may claim the extraordinary protection of a court of chancery.
Such a proceeding is as common and as free from difficulty as an ordinary injunction-bill, against a proceeding at law, or to stay waste or trespass. The powers of a court of chancery are as well adapted, and as effectual for relief in the case of a private nuisance, as in either of the cases named. And, in regard to the exercise of these powers, it is of no importance whether the eastern channel, over which the bridge is thrown, is wholly within the limits of the State of Virginia. The Ohio being a *565 navigable stream, subject to the commercial power of Congress, and over which that power has been exerted; if the river be within the State of Virginia, the commerce upon it, which extends to other States, is not within its jurisdiction; consequently, if the act of Virginia authorized the structure of the bridge, so as to obstruct navigation, it could afford no justification to the Bridge Company.
The act of Virginia, under which the bridge was built, with scrupulous care, guarded the rights of navigation. In the 19th section, it is declared "That, if the said bridge shall be so constructed as to injure the navigation of the said river, the said bridge shall be treated as a public nuisance, and shall be liable to abatement, upon the same principles and in the same manner that other public nuisances are." And, in the act of the 19th of March, 1847, to revive the first act, it is declared, in the 14th section, "that if the bridge shall be so erected as to obstruct the navigation of the Ohio River, in the usual manner, by such steamboats and other crafts as are now commonly accustomed to navigate the same, when the river shall be as high as the highest floods hereinbefore known, then, unless, upon such obstruction being found to exist, such obstruction shall be immediately removed or remedied, the said last-mentioned bridge may be treated as a public nuisance, and abated accordingly."
This is a full recognition of the public right on this great highway, and the grant to the Bridge Company was made subject to that right.
It is objected that there is no act of Congress prohibiting obstructions on the Ohio River, and that until there shall be such a regulation, a State, in the construction of bridges, has a right to exercise its own discretion on the subject.
Congress have not declared in terms that a State, by the construction of bridges, or otherwise, shall not obstruct the navigation of the Ohio, but they have regulated navigation upon it, as before remarked, by licensing vessels, establishing ports of entry, imposing duties upon masters and other officers of boats, and inflicting severe penalties for neglect of those duties, by which damage to life or property has resulted. And they have expressly sanctioned the compact made by Virginia with Kentucky, at the time of its admission into the Union, "that the use and navigation of the River Ohio, so far as the territory of the proposed State, or the territory that shall remain within the limits of this Commonwealth lies thereon, shall be free and common to the citizens of the United States." Now, an obstructed navigation cannot be said to be free. It was, no doubt, in view of this compact, that in the charter for the bridge, it was required to be so elevated, as not, at the greatest height of the *566 water, to obstruct navigation. Any individual may abate a public nuisance. 5 Bac. Ab. 797; 2 Roll. Ab. 144, 145; 9 Co. 54; Hawk. P.C. 75, sect. 12.
This compact, by the sanction of Congress, has become a law of the Union. What further legislation can be desired for judicial action? In the case of Green et al. v. Biddle, (8 Wheat. 1,) this court held that a law of the State of Kentucky, which was in violation of this compact between Virginia and Kentucky, was void; and they say this court has authority to declare a State law unconstitutional, upon the ground of its impairing the obligation of a compact between different States of the Union.
The case of Wilson v. The Blackbird Creek Marsh Company, (2 Peters, 250,) is different in principle from the case before us. A dam was built over a creek to drain a marsh, required by the unhealthiness it produced. It was a small creek, made navigable by the flowing of the tide. The Chief Justice said it was a matter of doubt, whether the small creeks, which the tide makes navigable a short distance, are within the general commercial regulation, and that in such cases of doubt, it would be better for the court to follow the lead of Congress. Congress have led in regulating commerce on the Ohio, which brings the case within the rule above laid down. The facts of the two cases, therefore, instead of being alike, are altogether different.
No State law can hinder or obstruct the free use of a license granted under an act of Congress. Nor can any State violate the compact, sanctioned as it has been, by obstructing the navigation of the river. More than this is not necessary to give a civil remedy for an injury done by an obstruction. Congress might punish such an act criminally, but until they shall so provide, an indictment will not lie in the courts of the United States for an obstruction which is a public nuisance. But a public nuisance is also a private nuisance, where a special and an irremediable mischief is done to an individual.
In the case of the City of Georgetown v. The Alexandria Co. (12 Peters, 98,) this court say, "The court of equity, also, pursuing the analogy of the law, that a party may maintain a private action for special damages, even in case of a public nuisance, will now take jurisdiction in case of a public nuisance, at the instance of a private person, where he is in imminent danger of suffering a special injury, for which, under the circumstances of the case, the law would not afford an adequate remedy." Where no special damage is alleged, an individual could not prosecute in his own name for a public nuisance. This doctrine is laid down in Conning et al. v. Lowerre, 6 Johns. *567 Ch. 439. In that case the injunction was granted, and the chancellor said, "that here was a special grievance to the plaintiffs, affecting the enjoyment of their property and the value of it. The obstruction was not only a common or public nuisance, but worked a special injury to the plaintiffs."
Chancellor Kent, in the 3d volume of his Commentaries, 411, says, "The common law, while it acknowledged and protected the right of the owners of the adjacent lands to the soil and water of the river, rendered that right subordinate to the public convenience, and all erections and impediments made by the owners, to the obstruction of the free use of the river as a highway for boats and rafts are deemed nuisances."
In Sampson v. Smith, (8 Simons, 272,) it was held that injury to the plaintiff's trade was sufficient to give jurisdiction against a public nuisance, and that it was not necessary to use, in such a prosecution, the name of the attorney-general. And this was on a bill for the discontinuance of works already erected.
It is said, "the question of nuisance, or not, must, in cases of doubt, be tried by a jury." 2 Story's Eq. 202. In this respect the question is similar to an application for the protection of a patent. Where the right has been long enjoyed, or is clear of doubt, chancery will interfere without a trial at law. Mr. Justice Story says, (Id. 203,) "A court of equity will not only interfere upon the information of the attorney-general, but also upon the application of private parties, directly affected by the nuisance; whereas, at law, in many cases the remedy is, or may be, solely through the instrumentality of the attorney-general."
In the same volume, (p. 204,) it is said, "In regard to private nuisances the interference of courts of equity, by way of injunction, is undoubtedly founded upon the ground of restraining irreparable mischief, or of suppressing oppressive and interminable litigation, or of preventing multiplicity of suits." Mit. Eq. Pl. by Jeremy, 144, 145; Eden on Injunctions, ch. 11, 231, 238.
"There must be such an injury, as from its nature is not susceptible of being adequately compensated by damages at law, or such as, from its continuance or permanent mischief, must occasion a constantly recurring grievance, which cannot otherwise be prevented than by an injunction." "Formerly, indeed, courts of equity were extremely reluctant to interfere at all, even in regard to repeated trespasses. But now there is not the slightest hesitation, if the acts done, or threatened to be done to the property, would be ruinous or irreparable." 2 Story's Eq. 207.
In Ripon v. Hobart, 3 Mylne & Keen, 169, Lord Brougham says, "If the thing sought to be prohibited is in itself a nuisance, the court will interfere to stay irreparable mischief without *568 waiting for the result of a trial; and will, according to the circumstances, direct an issue or allow an action," &c. Lord Eldon, in the case of Attorney-General v. Cleaver, 18 Ves. 218, appeared to think that there was no instance of an injunction to restrain a nuisance without trial. But in this he was clearly wrong.
The fact that the bridge constitutes a nuisance is ascertained by measurement. The height of the bridge, of the water, and of the chimneys of steamboats, are the principal facts to be ascertained. If the obstruction exists, it is a nuisance. To ascertain this a jury is not necessary. It is shown in the report, by a mathematical demonstration. And the other matters, connected with the case, as to the benefit of high chimneys, lowering of them in passing under the bridge, and shortening chimneys, are matters of science and experience, better ascertained by a report than by a verdict. And the same may be said of the statistics which are in the case.
The object of the suit was, not the recovery of damages, but to enjoin the defendants from building the bridge which would injure the plaintiff. If the bridge be a material obstruction to the navigation of the Ohio, it is not denied that the plaintiff would be injured. The ground of defence taken and maintained is, that the bridge is not a material obstruction to commerce on the river. On this point there is no doubt. A jury, in such a case could give no aid to the court, nor security to the parties. Having had notice of an application for an injunction, before the defendants had thrown any obstruction over the river, they cannot claim that their position is strengthened by the completion of the bridge.
But it is said, the bridge constitutes no serious obstruction to the navigation of the Ohio; that only seven steamboats, of two hundred and thirty which ply upon the river as high as Pittsburg, are obstructed; and that arises from the height of their chimneys, which might be lowered at a small expense, in passing under the bridge; that by the introduction of blowers, the chimneys might be shortened without lessening the speed of the boats; that the goods and passengers which are conveyed on the public lines of communication, between Pittsburg and Philadelphia, could be as well conveyed on boats of lower chimneys, and consequently the State, as proprietor of those lines, if at all injured, is injured so inconsiderably as not to lay the foundation of this procedure; that none of the packets or the other boats on the river are owned by the State of Pennsylvania.
That the bridge constitutes an obstruction, is shown by the report of the commissioner, the answer of defendants, the proof in the case, and by the admission in the argument of the counsel for the defendants. The report of the commissioner is considered, *569 as to the fact of the obstruction and the extent of it, of the same force as a verdict of a jury. The report having been the result of a most arduous and scientific investigation of the facts, is entitled to the full weight of a verdict. 2 Railway Cases, 330. The fact of obstruction was a plain and practical question, but it was connected with other matters involving questions of science, which were to be settled on the opinion of experts, and a report being fairly made, the court will, generally, assume it as a basis of action, unless it shall be shown to have been made under improper influences, or through a mistake of facts. 1 Railway Cases, 576; Shelford on Railways, 430.
In his report the commissioner says: "The boats running in that line, and passing the site of the present suspension-bridge, in 1849, previous to the time when the first cables were thrown across the eastern branch of the Ohio, at Wheeling, were the Clipper, No. 2; the Hibernia, No. 2; the Brilliant; the Messenger, No. 2; the Isaac Newton; the New England, No. 2; and the Monongahela.
"The Clipper, No. 2, came out in March, 1846, was 215 feet long, and had chimneys 64 feet high. The Hibernia, No. 2, came out in 1847. She was 225 feet long, and her chimneys were 72½ feet high from the water. The Brilliant came out in February, 1848, was 227 feet long, and had chimneys 71 feet high. The Messenger, No. 2, came out in the Winter or Spring of 1849, was 242 feet long, and has chimneys 76 1/3 feet high. The Isaac Newton was 182 feet long, and had chimneys only 63½ feet high. The New England, No. 2, was 222 feet long, and her chimneys were 65 2/3 feet high. "The dimensions and height of the chimneys of the Monongahela," the commissioner says, "I have not been able to ascertain from the evidence."
"There were also two other regular packets running past Wheeling in the Spring and Summer of 1849, previous to the erection of the bridge; the two Telegraphs, running as regular packets between Pittsburg and Louisville. The chimneys of the Telegraph, No. 1, were 80 feet high, and those of the other Telegraph were 79 feet 9 inches high.
"Not more than two or three of these nine packets had their chimneys prepared for lowering at the close of the navigation in the Summer of 1849. And of the five largest only one of them could have gotten under the bridge on a twenty feet stage of water with the chimneys standing; and that one, the Brilliant, could not have gotten under when the water was more than twenty-one feet upon the Wheeling Bar. And neither of the two Telegraphs could have gotten under the bridge at a thirteen feet stage of the water with their chimneys standing."
*570 "If the bridge," says the commissioner, "had been erected in 1847, therefore, and those nine packets had then been running, two of them could not have gotten under the bridge for nearly three months, when the water was thirteen feet and over; two of them would have been unable to get under for thirty-three days, when the water on the bar was twenty feet and over; another, the Brilliant, from nineteen to twenty-five days, when the water was twenty-nine feet and over; and the other four as much as ten days, when the water was twenty-nine feet and over,  unless they had lowered or cut off their chimneys."
"The passage of three of the Pittsburg and Cincinnati packets, which were running on the Ohio before the erection of the bridge, had been actually stopped or obstructed by such bridge previous to the order of reference in this cause: the Messenger, No. 2, the Hibernia, No. 2, and the Brilliant.
"The first of these boats arrived at the bridge on the 10th of November, 1849, on her downward passage, upon a twenty feet stage of water, and had to cut off her chimneys before she could pass the bridge. She was detained there about seven hours, but I believe she did not lose her trip or passengers. She was subsequently detained at the bridge seven hours, and was obliged to cut off her chimneys a second time.
"On the 11th of November, 1849, the Hibernia, No. 2, reached the bridge on her upward trip. They attempted to get her under the bridge by sinking her deeper in the water with coal ballast. But, in attempting to pass the bridge, the top of one of her chimneys caught upon a projection from the under side of one of the flooring timbers, and injured the chimney so that it had to be taken down and repaired. The boat was detained thirty-two hours at Wheeling on that occasion; and was obliged to hire another boat to take her passengers on to Pittsburg, except such of them as preferred to cross the mountains by the way of Cumberland.
"On the 18th of the same month the passage of the Hibernia, No. 2, was again obstructed by the bridge on her downward passage; by which she lost an entire trip. Finding she could not get under the bridge in time to save her trip, she transferred her freight and passengers to another boat, and returned to Pittsburg. And the passage of the same boat was again obstructed by the bridge in coming up the river last Spring. On that occasion she arrived at Wheeling between nine and ten o'clock in the morning, and finding she could not get under the bridge she gave up the trip, and landed her passengers, who proceeded east by way of Cumberland.
"The Brilliant was obstructed by the bridge on her passage *571 up on the 18th December, 1849, and had to wait until her chimneys could be cut off to enable her to pass under the bridge. The chimneys were cut off at great risk to the lives of those who were engaged in the operation; and the boat passed under the bridge and proceeded to Pittsburg after a detention of four or five hours.
"In the Winter and Spring subsequent to the erection of the bridge, the Buckeye State, the Keystone State, and the Cincinnati, three new packets, were brought into the Pittsburg and Cincinnati lines, in the places of the New England, No. 2, the Isaac Newton, and the Monongahela. They were all of much larger dimensions and had much taller chimneys than the old boats for which they were substituted, and their chimneys were hinged and rigged for lowering." The chimneys of the Buckeye State were 74 feet 8 inches high, those of the Keystone 77 feet 5 inches, and those of the Cincinnati 84 feet 7 inches.
"Two accidents have occurred to those new boats in passing under the bridge since they came out. The Keystone State, on her downward passage, the 4th of March last, in attempting to pass under the apex of the bridge upon a thirteen and a quarter feet stage of water, could not get near enough to the Wheeling shore to pass under the apex of the bridge. And in attempting to drop down about twenty feet further west, one of the chimneys struck the bridge and tore away all the guys or fastenings of both chimneys, except one guy-rod, broke the westerly chimney in two, broke off the hinge from the other chimney, and tore up some portions of the hurricane deck to which the guy-rods were fastened. And if the remaining guy-rod had given way, both chimneys, weighing together about four tons, would have fallen down."
A somewhat similar accident, it seems from the report, occurred to the Cincinnati, in October, 1850.
On the practicability and safety of lowering the chimneys a great number of witnesses were examined. And the commissioner says, although there was great conflict in the testimony as respects the danger to the limbs and lives of the passengers in the operation, yet, he says, when the facts sworn to are examined, there is a decided preponderance against the safety of lowering the chimneys. And he remarks, "The very elevated as well as large chimneys used upon the Cincinnati and Pittsburg packets, and other boats of that class, cannot certainly with any facility or safety be lowered by hinges at the tops. They are therefore obliged to lower them at the hurricane-deck, by means of a derric. The weight of the parts of the two chimneys which must be let down upon those large boats is estimated by the witnesses to be from three to four tons. This *572 enormous weight hanging over the cabin, or rather over the berths of passengers, in process of lowering, would probably prove disastrous in the extreme if by any accident the chimneys should come down by the run; which is very likely to occur, from the carelessness or stupidity of the green hands that the owners and officers of Western boats are so often obliged to employ."
And if to the difficulties stated in the report there be added the darkness of the night, a snow storm, or the falling rain congealing on the roof of the boat and covering it with ice, and a high wind, which generally is experienced in a storm, it would be impracticable, while the boat was proceeding at the rate of ten or twelve miles an hour, to lower the chimneys, and this must be done or the boat must land. During this operation, the pilot, on whom the safety of the boat and the lives of the passengers in a great degree depend, must, from his position, be in imminent danger.
The expense of lowering the chimneys, if practicable and safe, would constitute no inconsiderable item. The time lost in raising and lowering chimneys is variously estimated by the witnesses at from one to three hours. Take the minimum of such estimate, and, according to the calculation of Colonel Long, the expense of the boat amounts to $8.33 per hour. Each packet will have to lower its chimneys every time it passes under the bridge, which will be, ordinarily, sixty times a season, amounting to the sum of $499.80, a charge on each packet. To this may be added the apparatus for lowering the chimneys, estimated at $400, which, with its repairs, may be estimated at $100 per annum during the life of the boat, which averages five years. And it is in proof that stationary chimneys will last five years, but if subject to be lowered they will only last half that time. The cost of chimneys for a boat is stated at $1000, which may be considered as an increased expense to each boat of $200 per annum. These sums added together make a total of $799.80, which sum multiplied by seven, the number of the packets, make the sum of $5,598.60 which the owners of these packets must necessarily pay as an annual tax, by reason of the obstruction of the bridge, if they run their boats and lower their chimneys.
But it is contended that the difficulty of passing under the bridge may be obviated by shortening the height of the chimneys without lessening materially the speed of the boat.
That high chimneys increase the speed of the boat is proved in the case practically and scientifically.
Professors Renwick, Byrne, and Locke say, that by a law of nature the force or velocity of a draft depends upon the height *573 of the chimney; the force and velocity being measured by the difference in the weight between the column of air within the chimney and an outside column of equal height and diameter; so that a reduction of the height of the chimney involves a diminution of that force with which nature supplies air to combine with fuel for combustion, and by consequence there follows a diminution of heat developed in the furnace, of steam generated in the boiler, and of power by which the wheel is moved and the boat propelled.
The commissioner, in his report, says, "the deduction of science also shows that the draft is increased by elongating the chimneys." In this question economy of fuel is not the object to be attained, but the greatest practicable speed consistent with safety. And this is attained, where there is no defect in the furnace, by the combustion of the largest amount of fuel. Forty-three bushels of bituminous coal are consumed per hour by each of the Pittsburg packets.
The commissioner says, "In relation to the question whether chimneys as high as those now in use upon the Pittsburg and Cincinnati packets, and some of the larger boats on the Ohio, are necessary for obtaining the maximum of speed desirable in the navigation of the river, there is a diversity of opinion among the witnesses, especially among those who are not acquainted with the scientific principles of chimney-draft in reference to the combustion of fuel for the generation of steam. But I think there is a great preponderance of the testimony even of that class of witnesses in favor of the necessity of very high chimneys upon the large Ohio steamboats."
And he further remarks: "Rejecting the deductions of science on the subject, the teachings of experience show, that as boats upon the Ohio have been gradually improved in their dimensions, from time to time, and the height of their chimneys increased, they have been enabled to run with greater speed, to the evident advantage of commerce and of travel upon the rivers. And the fact that several different projects, for procuring artificial draft, such as blowers, as an available substitute for the draft of tall chimneys, have been tried upon the Western waters and have failed and been abandoned, is very strong evidence in favor of the necessity of natural draft for the combustion of wood and bituminous coal upon the steamboats navigating the Ohio."
There is no better evidence of utility, than the progress made in the structure of steamboats and of the machinery by which they are propelled. Men who are engaged in navigation learn by experience and adopt that which will be most conducive to their own interests.
*574 It appears, from the statement of Scowden, an engineer, that the chimneys of the first boat, called the Cincinnati, were 84 feet high from the surface of the water when light, and about 74 feet high from the centre of the flues. Her chimneys were shortened 8 feet, and it diminished her speed up stream from a mile to a mile and a half per hour. Captain Hazlep states that, adding 8 feet to the chimney of the Telegraph, in 1849, increased her speed about half a mile an hour up stream. And by Captain Duval, that the Clipper's chimney being cut off 8 feet, in order to pass the Wheeling Bridge, reduced her speed about three hours between Cincinnati and Pittsburg. And it may be fairly inferred, that a reduction of 20 feet would reduce the speed between Cincinnati and Pittsburg about four hours.
According to this estimate, the cost of the boat per hour being, as above stated, $8.33, if there should be an average loss of four hours in each trip, it would amount to $33.32. This sum multiplied by sixty, the average number of trips each season, would amount to the sum of $1,999.20, and this being multiplied by seven, the number of the packets, would make the sum of $13,994.40, an annual loss by the owners of the packets, by reducing the height of their chimneys, so as to pass under the bridge at the different stages of the water.
But it is said these seven packets are the only boats obstructed by the bridge of the two hundred and thirty which ply upon the Ohio, and run to Pittsburg.
The transportation of goods and passengers by these packets will show their relative importance, as instruments of commerce, between Cincinnati and Pittsburg. From the evidence, it appears that they convey about one half of the goods in value and three fourths of the passengers, between those cities. Taking the Keystone State as a criterion, each packet transports annually thirty thousand nine hundred and sixty tons of freight, and twelve thousand passengers. The line was established in 1844, and it appears from the proof, that since that time it has transported between the above cities, nearly a million of passengers.
It is in proof that the life of these packets averages five years, when their places in the line must be supplied by new boats. If to their original cost of construction, there be added the expense of running them for five years, adding nothing for repairs or accidents, a total sum will be expended of $1,680,000. This amount of capital is appropriated every five years in running this line of packets. The structure of the bridge cost less than one eighth of that sum.
The speed of these boats, their excellent accommodations, and their general good management, recommend them to the public, as is shown by the large amount of goods and passengers *575 they convey. And any change in their structure, or in the production of the propelling power, which shall impede their progress, would not only impose upon their proprietors a most onerous tax, but it would greatly lessen their profits, by reducing the amount of freight and passengers. And no part of the amount would, probably, pass to other boats on the river, but to the northern or southern lines, where greater expedition is given.
In the report of the commissioner, a statement is made of the stages of water, at Wheeling, for twelve years, beginning on the 10th of March, 1838, and ending on the 9th of the same month, 1850.
The highest part of the bridge, by actual measurement from the ground, is 91.31 feet. This elevation is only at a single point, two hundred and eighty-four feet from the face of the eastern abutment. From the apex it deflects east and west, being at the distance of forty feet westward only 89.48 feet above the ground, and at the same distance east only 89.77 feet above the ground. The chimneys on the seven packets require a space of about thirty feet in width to pass under the bridge within the eighty feet allowed, and the depth of water and a sufficient headway, must be deducted, to show the height of the bridge for the passage of boats. The headway required, as appears from the report of the engineer, should be between the tops of the chimneys and the lowest parts of the bridge, from two to three feet. This would reduce the space, say two feet and a half to 87.27 feet.
In the twelve years above stated, the water was at the stage of twenty-one feet and over, two hundred and nineteen days; consequently no boat, whose chimneys were 66½ feet high, could have passed under the bridge. Twenty-one feet of water, are substituted for twenty feet in the table reported, that statement allowing a foot of water below the measurement. The water, in the above period, was twenty-six feet and over, eighty-three days, during which time no boat could have passed under the bridge whose chimneys were 62 feet high. The water was twenty-eight feet and over, fifty-five days during the twelve years, which would have prevented a boat from passing under the bridge, whose chimneys were 60 feet high. Within the same period, the water was sixteen feet and over, five hundred and thirty-four days; consequently boats, whose chimneys were 72 feet high, during that whole time could not have passed under the bridge.
In his report, the commissioner says, "The bridge is nine hundred and eighty feet between the bases of the two abutments. At the highest point of the bridge, for the distance of about fifty-six feet in width, there is a clear headway, for the *576 passage of steamboats with their chimneys standing, of 91 feet above extreme low water. But this space of fifty-six feet in width is not over any part of the river at extreme low water. The water upon the Wheeling Bar must be about four feet deep, to bring the easterly edge of the stream under the western extremity of the fifty-six feet. And it must be more than fifteen feet deep upon the bar to enable a steamboat, drawing five feet, to avail itself of the ninety-one feet headway above low-water mark, for the whole width of fifty-six feet."
"It follows, from this statement of facts, that a steamboat, drawing five feet of water, and whose chimneys are 79½ feet high or over, can never pass under the apex of the bridge, at any stage of the water, without lowering her chimneys."
From the data referred to, the defendants' counsel contend that in a few years, at most, there will be a concentration of railroads at Wheeling, and at other places on the Ohio, connecting the Eastern with the Western country, which, from their speed and safety, must take from the river the passengers and a considerable portion of the freight now transported in steamboats. That these roads, crossing the Ohio River, will reach the commercial ports of the interior, and diffuse a larger amount of commerce than that which is now transported on the Ohio. And it is intimated that the Wheeling Bridge may be used by the railroad cars; but it is clearly proved that the bridge is not calculated for such a transportation.
However numerous these roads may be, there can be no doubt, that, like similar roads in other parts of the country, their cars will be loaded with freight and passengers. But it may not follow that the Ohio and our other rivers will be deserted, or their business reduced. We have an extent of river coast, counting both shores, exceeding twenty-five thousand miles, through countries the most fertile on the globe. This is a greater distance than the combined railways of the world. That our railroads, as avenues of commerce, may develop our resources in a greater degree than is now anticipated, must be the desire of every one. But the great thoroughfares, provided by a beneficent Providence, should neither be neglected nor abandoned. They will still remain the great arteries of commerce.
Past experience teaches us, that however the facilities of commerce may be multiplied, her tracks will be filled with productions which enrich the country and add to the comforts and enjoyments of its rapidly increasing population. The rewards of labor will give an irresistible impulse to enterprise which must secure to our country a prosperity unequalled in history. Our internal commerce is more than three times as great as our foreign, and the increased lines of intercourse will cause both *577 rapidly to advance. The protection of the river commerce is by no means hostile to any other. The multiplication of commercial facilities will, in the same proportion, increase the articles of trade.
If viaducts must be thrown over the Ohio for the contemplated railroads, and bridges for the accommodation of the numerous and rising cities upon the banks of the river, it is of the highest importance that they should not be so built as materially to obstruct its commerce. If the obstructions which have been demonstrated to result from the Wheeling Bridge, are to be multiplied as these crossways are needed, our beautiful rivers will, in a great measure, be abandoned. An experience of forty years shows how much may be done in the structure of steamboats, in the improvement of their machinery, and the propelling power, to increase the speed and the comfort of that mode of transportation, under a continued reduction of expense. But if the limit of advance, in this respect, has already been passed; and a retrograde movement is necessary, by rejecting the improvements recommended by ingenuity and experience, we close our eyes to one great source of our prosperity. What would the West now have been if steam had not been introduced upon our rivers, and their navigation had not remained free? Without an outlet for the products of a prolific soil and the instruments of mechanical ingenuity, the country could have made but little advance.
It is said that the interest of commerce requires navigable waters to be crossed, and that in such a case the inquiry should be, whether the benefit conferred upon commerce by the cross route, is not greater than the injury done. In the case of the King v. Sir John Morris, 1 Barn. & Adol. 441, it was held, that the injury cannot be balanced against the benefits secured. And in the case of the King v. George Henry Ward, 4 Ad. & El. 384, it was held, where the jury found that an embankment complained of was a nuisance, but that the inconvenience was counterbalanced by the public benefit arising from the alteration it amounted to a verdict of guilty.
If the obstruction be slight, as a draw in a bridge, which would be safe and convenient for the passage of vessels, it would not be regarded as a nuisance, where proper attention is given to raise the draw on the approach of vessels. Of this character is the complaint of the plaintiff against the bridge, that it obstructs sea-vessels built at Pittsburg. Sails cannot be used to advantage on the Ohio or the Mississippi, consequently there can be no necessity of raising the masts until it becomes necessary to hoist the sails. Such vessels float down the river or are towed by steam-vessels.
*578 It is true the injury done to the State of Pennsylvania may seem to be small, when compared to the magnitude of this subject. It applies to all our rivers, and affects annually a transportation of many millions of passengers, and a commerce worth not less than six hundred millions of dollars. It would be as unwise as it is unlawful to fetter, in any respect, this vast commerce.
In all the charters, granted for the construction of bridges over navigable waters, it is believed all the States, not excepting Virginia, have provided that their navigation should not be obstructed.
The Bridge Company had legal notice of the institution of the suit, and of the application for an injunction to stay their proceedings, before their cables were thrown across the river. This should have induced them to suspend, for a time, their great work, alike creditable to the enterprise of their citizens, and the genius and science of the engineer who planned the bridge and superintended its construction. It is a matter of regret that, by the prosecution and completion of the bridge, they have incurred a high responsibility.
For the reasons and facts stated, we think that the bridge obstructs the navigation of the Ohio, and that the State of Pennsylvania has been, and will be, injuréd in her public works, in such manner as not only to authorize the bringing of this suit, but to entitle her to the relief prayed.
Believing, from the estimates in the case, that the obstruction to the navigation of the river may be removed by elevating the bridge, at an expense which, when added to the original cost, will leave a reasonable profit to the stockholders, on the entire capital expended, we have endeavored to ascertain the lowest point of elevation which will secure this object. And, on a full view of the evidence, we are brought to the conclusion, that an elevation of the lowest parts of the bridge for three hundred feet over the channel of the river, not less than one hundred and eleven feet from the low-water mark, will be sufficient  the flooring of the bridge descending from the termini of the elevation, at the rate of four feet in the hundred; this will give a level headway for boats of three hundred feet in width, and will enable those whose chimneys are eighty feet high to pass under the bridge when the water is thirty feet deep from the ground, leaving the tops of the chimneys two feet below the lowest parts of the bridge. If this or some other plan shall not be adopted which shall relieve the navigation from obstruction, on or before the 1st day of February next, the bridge must be abated.
We do not deem it necessary to provide against the floods, which seldom occur, and which, when at the highest, overwhelm the lower parts of our cities and towns on the banks of the *579 Ohio, and necessarily suspend, for a short time, business upon the river.
Mr. Chief Justice TANEY dissenting.
As this is a case of much importance to the parties and the public, and I do not concur in the judgment of the court, it is my duty to express my opinion. I shall do so as briefly as I can.
The first question to be decided is, whether this bridge is a public nuisance or not, which this court has a right to abate. The State of Pennsylvania, it is true, complains of an interruption to her canals, in which, in her character as a State, she has a proprietary interest, analogous to that of an individual owner. She seeks redress for this injury. But she proceeds upon the ground that the bridge is a public nuisance, from which the State receives a particular injury to its property beyond that which the public in general sustain. And the foundation of her claim, as stated in the bill, is, that the bridge is an unlawful obstruction to the navigation of a public river, and therefore a public nuisance. The immense mass of testimony, contained in this record, is directed almost altogether to that point. In order, therefore to maintain the bill, it is incumbent upon the State to show that this bridge is a public nuisance. And, if it is a public nuisance, it must be because it is a violation of some law which this court has a right to administer.
In examining this question, it must be borne in mind that, although the suit is brought in this court, the law of the case and the rights of the parties are the same as if it had been brought in the Circuit Court of Virginia, in which the bridge is situated. Pennsylvania, as a State, has the right to sue in this court. But a suit here merely changes the forum, and does not change the law of the case or the rights of the parties. And if, in the Circuit Court of the United States, sitting in Virginia, this bridge could not be adjudged a nuisance, and abated as such, neither can it be done in this court. The State, in this controversy, has the same rights as an individual, and nothing more. And the court is bound to administer to the State here the same law that would be administered to an individual suitor, suing for a like cause, in a Circuit Court of the United States, sitting in the State where the bridge is erected.
Assuming, then, that it does obstruct a public navigable river, and would, at common law, be a public nuisance, I proceed to inquire whether this court is authorized to declare it to be such, and order it to be abated.
The Ohio being a public navigable stream, Congress have undoubtedly the power to regulate commerce upon it. They *580 have the right to prohibit obstructions to its navigation; to declare any such obstruction a public nuisance; to direct the mode of proceeding in the courts of the United States to remove it; and to punish any one who may erect or maintain it; or it may declare what degree or description of obstruction shall be a public nuisance: as, for example, the height of a bridge over the river, or the distance to which a wharf may be extended into its navigable waters.
But this power has not been exercised. There is no law of the United States declaring an obstruction in the Ohio or any other navigable river, to be a public nuisance, and directing it to be abated as such. Nor is there any act of Congress regulating the height of bridges over the river. We can derive no jurisdiction, therefore, upon this subject, from any law of the United States, and if we exercise it we must derive our authority from some other source.
But we cannot derive it from the common law. For it has been settled, since the beginning of this government, that the courts of the United States as such, have no common-law jurisdiction, civil or criminal, unless conferred upon them by act of Congress. It is true that the courts of the United States, when sitting in a State, administer the common law, where it has been adopted by the State. But it is administered as the law of the State, under the authority and direction of the act of Congress, which makes the laws of the State the rule of decision in a court of the United States, when sitting in the State, provided such laws are not contrary to the Constitution, laws, or treaties, of the United States. We cannot, under the rule of decision thus prescribed, adjudge this bridge to be a nuisance, although it may obstruct the navigation of the river, unless it is a nuisance by the common law, as adopted in Virginia and modified by its statutes. But this bridge was built under the authority of a statute of the State. The structure, in its present form, has been sanctioned by the legislature. It is therefore no offence against the laws of the State; and a Circuit Court of the United States, sitting in the State and governed by its laws, when not in conflict with the Constitution or laws of the United States, or treaties, could not order it to be abated as a public nuisance; and this court has no higher power over this subject, either at law or in equity, nor any other rule to guide it, than a Circuit Court sitting in Virginia. And as the bridge is not a nuisance by the laws of that State, and there is no act of Congress making the obstruction of a public river an offence against the United States, and we have no common law to which the court may resort for jurisdiction, I do not understand by what law, or under what authority, this court can adjudge it to be a public nuisance and proceed to *581 abate it, either upon a proceeding in chancery or by a process at law.
If it is a public nuisance, it is an offence either against the United States or the State of Virginia, for which the persons who erected or who continue it, are liable to be indicted. For we need go no further than Blackstone's Commentaries (4 Bl. Com. 167,) for proof that the unauthorized obstruction of a navigable river is an offence, and may be punished in a criminal proceeding by indictment. Can the parties who built or continue this bridge be indicted for it as an offence against the public? This appears to me to be the true test. We are inquiring whether there is any law which the court has the power to administer, under which this bridge may be adjudged a public nuisance or purpresture? If there is, then the persons who erected it may be punished in a criminal proceeding.
For if it is a public nuisance or purpresture, it is an offence against the sovereignty whose laws have been violated. Could they be indicted for an offence against the United States? This will hardly be contended for, as common-law offences cannot be punished in its courts, unless they are declared offences by act of Congress. And as we have no such act of Congress, it is clear that an indictment charging the obstruction as an offence against the United States, could not be maintained. It is equally clear, that an indictment, charging it as an offence against the State, could not be supported, for the law of the State sanctions its construction. It may be asked, in reply to this view of the subject, is this great river then liable to be obstructed by bridges whenever the States, through whose territories it passes, choose to authorize them? and are the inhabitants above the obstructions to be shut out from its navigation, and without redress? The argument ab inconvenienti would be entitled to great consideration, if there was any foundation for it, although it would not alter the law. But this opinion leads to no such result. For I have already said that Congress have the power to declare the obstruction of a navigable stream an offence against the United States, and to authorize the courts of the United States to abate it as a nuisance; and any law of a State to the contrary would be unconstitutional and void.
If, therefore, there be an evil, it may easily be corrected by the legislative authority of the general government. But if Congress have not thought proper, or do not think proper, to exercise this power, and public mischief has arisen, or may arise from it, it does not follow that the judicial power of the United States may step in and supply what the legislative authority has omitted to perform. It does not by any means follow that the judicial power may declare an obstruction in or over a navigable stream, *582 an offence against the United States before the legislative power has forbidden it, and conferred authority upon the courts to punish or remove it.
Undoubtedly this court has original jurisdiction when a State is a party. But it cannot exercise that jurisdiction without some law prescribing the mode of proceeding, the rule of decision, and the evidence by which the right in dispute is to be tried. The unskilful and careless manner in which a steamboat is navigated may impede the passage of other vessels, and sometimes endanger their safety, yet if Pennsylvania sued here for any injury arising from this cause, we could exercise no jurisdiction and give no redress unless there was some law to guide us. And when a case of this kind is not embraced in any law of the United States, we always resort to the established usages of navigation on the river, and the laws of the State in whose jurisdiction the injury was sustained.
The cases in which the court has taken jurisdiction in questions of boundary between States, stand on different ground. The original jurisdiction was conferred by the Constitution. The evidence upon which the right in controversy must be decided, depended upon the laws and usages of nations in disputes of that kind. Congress had no power over the subject. It could neither give nor take away the right of either party, nor prescribe the evidence by which it was to be tried. All that Congress was required to do, or could do, was to authorize the court to issue the proper process to bring the parties before it, and to conduct the proceedings to final judgment. This was admitted on all hands to be necessary before the court could exercise the jurisdiction which the Constitution had conferred. And in the case of New Jersey v. New York, (5 Pet. 287, 288,) it was held that the acts of 1789 and 1792 had clothed the court with the necessary power.
The rule as to navigable waters is this: Every independent nation has the exclusive jurisdiction over the navigable waters lying within its territorial limits. It has the right to regulate commerce upon them, and to determine what bridges may be built over them, or piers or wharves extended into them. And an erection authorized by the legislature cannot be a nuisance, public or private. This was the situation of the old States prior to the adoption of the Constitution. Each was then an independent sovereign State. But by the Constitution of the United States, they surrendered to the general government the power to regulate commerce. And thus, while they retain their absolute territorial jurisdiction over their navigable waters in all other respects, Congress may forbid the erection of any structure in a navigable stream, which it deems an obstruction to commerce, *583 and may declare it a nuisance, and direct it to be removed. But all the original authority of the State over the river remains subject to that limitation. For otherwise, until Congress thought proper to legislate, navigation on the river would be under no control. Boats might be run down with impunity, and obstructions of every kind erected in or over it, which the State could not prevent or punish.
The bridge in question is entirely within the territory of Virginia. Prior to the adoption of the Constitution of the United States, she had an unquestionable right to authorize its erection. She still possesses the same control over the river, subject to the power of Congress, so far as concerns the regulation of commerce. The United States and Virginia are the only sovereignties which can exercise any power over the river where the bridge is erected. Virginia has authorized it, and Congress have acquiesced in it. Congress have made no regulation declaring such a structure unlawful, or authorizing any judicial proceeding against it. If Congress, to whom the power is granted to regulate commerce, have acquiesced, how can the court, to whom the power is not granted, undertake to regulate it, and declare this bridge an unlawful obstruction, and the law of Virginia unconstitutional and void? With all my respect for my brethren, I think it is an error, and I had almost said, a grave one.
If it should be said that the compact between Virginia and Kentucky makes the river free independently of the Constitution, the answer is obvious. The compact does not deprive Virginia of the power to regulate the police of the river, or to authorize bridges or piers, or other structures in it. Such a compact between States has always been construed to mean nothing more than that the river shall be as free to the citizens or subjects for which the other party contracts, as it is to the citizens or subjects of the State in which it is situated. But if this compact or any compact should be construed to prohibit the erection of the bridge, the proceeding should be to enforce the observance of the compact. If erected in violation of a compact, it is still not a nuisance, because there is no law prohibiting it. It would be a breach of contract by the State, and the remedy in a very different mode of proceeding.
This compact between Virginia and Kentucky, in relation to the navigation of the Ohio, was one of the articles of agreement under which Virginia consented that Kentucky should become a separate State. Kentucky could not become a separate State without the consent of Congress. But the act of Congress, which gave that assent, makes no reference whatever to the terms of the agreement between the States. It does not make the United States a party to them, nor guarantee their execution. *584 It simply declares its consent that the district of Kentucky should, on the 1st of June, 1792, become a State, according to its actual boundaries, on the 18th of December, 1789. The act of Congress is in 1 Stat. at Large, 189, and contains no allusion whatever, direct or indirect, to the navigation of the Ohio. It leaves the compact as it was; that is, a compact between the two States, and nothing more, and to be enforced by a proceeding upon it. Nor is there any difference in the rights of navigation between the rivers and bays of the Atlantic States and those of the West. The old and the new States in this respect stand upon an equal footing. It was so decided in this court in the case of Pollard v. Hagan, (3 How. 212,) and that decision has been sanctioned in subsequent cases, to which it is not now necessary to refer.
The complainant, however, insists that the law of the United States for enrolling and licensing coasting vessels, gives to the vessel so enrolled and licensed, the right to navigate the river free from obstructions: that this law, therefore, by necessary implication, forbids the erection of the bridge which obstructs the navigation; and, consequently, defines the rights of the parties. And if a vessel is obstructed, the law is violated, and the injured party entitled to his remedy, and to have the obstruction removed. The case of Gibbons v. Ogden is relied on to support this proposition.
This brings up the question, whether the law of Virginia, sanctioning the erection of this bridge, is or is not repugnant to the Constitution or laws of the United States. Is it repugnant to the clause of the Constitution which gives Congress the power to regulate commerce? or to any law passed under it? If it is not, then the structure complained of, being within the territory of the State, and authorized by its legislature, cannot be a public nuisance or a private nuisance in the eye of the law. Nor has any one a right to complain of it as an unlawful obstruction in his way; nor to maintain a suit at law or in equity for any inconvenience or loss he may sustain from it. Assuming that we may exercise jurisdiction on the ground that the complainant claims a right under the above-mentioned act of Congress, neither the point nor the principles decided in Gibbons v. Ogden have, in my judgment, any application to the case before us. In that case, the Legislature of New York passed a law granting to certain persons the exclusive privilege of navigating all the waters within the jurisdiction of that State with boats moved by fire or steam; and authorizing the Chancellor of the State to restrain by injunction any person whatever from navigating these waters with boats of that description. The complainant claimed under the grantees of the monopoly, and sought *585 by his bill to restrain the respondents from navigating the waters embraced in it. And this court held, and correctly held, that the law of the State was unconstitutional; that a vessel enrolled and licensed for the coasting trade, under an act of Congress, had a right to navigate any of the navigable waters of the United States; and that no State had a right to forbid it.
There was no question in that case as to the authority of a court of the United States to declare an obstruction in a river, which a State had authorized, to be a public nuisance, and treat it as an offence against the United States. The waters in question were navigable, and free from impediments of that description; and the boats of the parties who claimed the exclusive privilege were daily passing over them. The only question in the case was, whether all vessels, enrolled and licensed by Congress, had not the right to pass over the same waters as freely as the vessels of the monopolists. The court said they had; that they had an equal right with the complainant to use the navigable waters of New York. But the court do not say that an obstruction placed in the water, which renders navigation inconvenient or hazardous, is a violation of the act for licensing and enrolling coasting vessels, or in conflict with it; nor do they say that this act of Congress confers on the court the power to adjudge it a nuisance, and order it to be abated. There was no such question before the court. It was not in the case, nor was the attention of the court in any way called to it by the argument.
Now, in this case, Virginia has passed no law giving exclusive privileges to navigate the Ohio River through her territory. If the bridge is an obstruction, her own citizens, engaged in the navigation of the Ohio, are equally disabled from passing as the citizens of any other State. The question, therefore, on which this case must turn, did not arise in Gibbons v. Ogden. But it did arise, and was expressly decided in the case of Wilson v. The Blackbird Creek Marsh Company, 2 Pet. 245. It was the point in the case. A dam across a navigable creek had been authorized by the Legislature of Delaware, as this bridge has been authorized by the Legislature of Virginia. It stopped a navigable creek, and, as the court said, must be supposed to abridge the rights of those who were accustomed to use it. So this bridge is supposed to impede the navigation of the Ohio, and abridge the rights of those accustomed to use it. Yet, in the case referred to, the court said, that as Congress, in the execution of its power to regulate commerce, had passed no law to control State legislation over these small navigable creeks, the law of Delaware was not repugnant to the Constitution, not being in conflict with any law of Congress. It will be remembered *586 that the act of Congress for enrolling and licensing vessels, under which Gibbons v. Ogden was decided, was still in force, but was regarded by the court as inapplicable to the obstruction occasioned by the dam. The result of these two cases is this. The act of Congress gives to vessels enrolled and licensed under it the right to navigate the public waters wherever they find them navigable; and any State law prohibiting it, is unconstitutional and void. And, upon this ground, the judgment of the State court of New York, which had decided otherwise, was reversed. But this act of Congress has no application to an obstruction created by a dam across the navigable water, and without further legislation by Congress, the law of Delaware, which authorized the dam, was constitutional and valid. And upon that ground, the judgment of the State court of Delaware, which sanctioned the obstruction, was affirmed. I can see no difference in principle between the last-mentioned case and the case at bar. There has been no further legislation by Congress on that subject since that case was decided. And as the principle is the same, the decision should be the same; and the case of Wilson v. The Blackbird Creek Marsh Company, should, in my opinion, govern this.
It can hardly be supposed, that the circumstance that a port of entry is established on the Ohio River, above the bridge, distinguishes this case from the one referred to. The right which the act of Congress gives to vessels enrolled and licensed for the coasting trade, is certainly not confined to the navigation between ports of entry. They have the right to enter any navigable creek or river which may suit their convenience, or the business and employment in which they are engaged. And any State law which forbids them to do so, or attempts to confine the right to particular persons, is unconstitutional. Any vessel enrolled and licensed had a right to proceed up Blackhird Creek as far as she found navigable water; and her right was as perfect as if a port of entry had been established at the head of navigation. Nor can the size of the creek, or the small number of vessels that used it, as compared with the Ohio, make any difference between the cases. It was the right that was in question; and that right was the same whether the navigable water was narrow or wide, or used only by a single vessel, or frequented by hundreds.
The case of Wilson v. The Blackbird Creek Marsh Company is entitled to the more weight, because it was decided after the case of Gibbons v. Ogden, which appears, by the report, to have been recalled to the attention of the court, and relied upon in the argument; and the opinion in the last case was delivered by the same learned judge who delivered the elaborate opinion *587 in the former one. It shows that he, and the learned court in which he presided, did not consider the principles on which Gibbons v. Ogden was decided, applicable to a case where an obstruction was placed in a navigable water, impeding, generally, the passage of vessels; and were of opinion that the courts of the United States had no jurisdiction which would authorize them to remove or abate it, or treat it as unlawful, without further legislation by Congress. I think it more safe to follow their own construction of their own opinion in Gibbons v. Ogden, than to look for a new one.
Indeed, apart from any decisions on the subject, I cannot perceive how the mere grant of power to the legislative department of the government to regulate commerce, can give to the judicial branch the power to declare what shall, and what shall not, be regarded as an unlawful obstruction; how high a bridge must be above the stream, and how far a wharf may be extended into the water, when we have no regulation of Congress to guide us. Nor do I see how we can order a bridge or a wharf to be removed, unless it is in violation of some law which we are authorized to administer. In taking jurisdiction, as the law now stands, we must exercise a broad and undefinable discretion, without any certain and safe rule to guide us. And such a discretion, when men of science differ, when we are to consider the amount and value of trade, and the number of travellers on and across the stream, the interests of communities and States sometimes supposed to be conflicting, and the proper height and form of steamboat chimneys, such a discretion appears to me much more appropriately to belong to the Legislature than to the Judiciary.
Besides, I think there is an insuperable objection to this proceeding in equity even if this bridge should be regarded as a nuisance, public or private. And it appears to me to be settled law in England, as well as in this country, that chancery will not interfere by injunction where the evidence is conflicting and the injury doubtful. I do not speak of informations in chancery where the attorney-general is a party, for this is not a proceeding of that kind. But I speak of cases between individual parties, like the present one. And the rule above stated, when there is a conflict of testimony, will be found in 2 Story's Com. page 201 to 207, where the subject is fully examined, and the cases which have been decided referred to. And a case where there is more conflict in the testimony of men of high character and undoubted skill and knowledge could hardly be imagined, than is presented in the record before us; nor a case where the injury is more doubtful. For, after the experience of two years, we see how small the loss has been compared with the immense *588 trade and the multitude of steamboats, which, during that time, have passed under it.
Neither can the jurisdiction of a court of chancery be supported upon the ground that the injury is immediate and irreparable, or that any serious embarrassments lie in the way of an action at law. The injury, after two years' experience, has not been found serious enough to lessen the navigation and commerce of the river. On the contrary, they have been continually increasing since this bridge was built. And if it be an injury for which the party is entitled to a remedy, he has a plain and adequate remedy at law; and, therefore, upon general principles of equity, and more especially under the express provisions of the act of 1789, he has no right to come into chancery for relief. And if an action at law were brought by the State in the Circuit Court of the United States, sitting in Virginia, the proceeding at law would be as free from embarrassment and difficulty as any action at law for any injury for which the law gives a remedy. And there is no reason to suppose that the respondents are not able to answer to any amount of damage, which, upon the evidence in this case, the State of Pennsylvania might recover against them.
If it should be said that as the Legislature of Virginia have sanctioned the erection of this bridge, prejudices in favor of it might be supposed to influence the jury, the answer is obvious. The law would be decided by the Circuit Court, subject to the revision and control of this court; and we are bound to presume that a jury, in a Circuit Court of the United States, would do equal justice between citizens of their own State, and another State or its citizens. The Constitution and laws so presume. And, certainly, this court would never act upon any apprehension that justice would not be done, by a jury in any State, when summoned and impanelled according to the laws of the United States. And still less could it be induced to assume extraordinary and unusual powers from fears or suspicions of that kind.
But Pennsylvania has the right to sue in this court, or in the Circuit Court, at her election. She has the same right to sue here in an action at law as she has to file her bill in equity. And in an action at law brought here by the State of Georgia v. Brailsford et al. (3 Dal. 1,) the case was tried by a jury in the same manner as if the suit had been brought in the Circuit Court. And the jury, brought here to try this case, would be altogether free from suspicion of bias or prejudice.
It may be said that such a proceeding here would embarrass and retard the business of this court, and would be expensive and onerous to the complainant, as the witnesses must be *589 brought from a distance and detained here for a considerable time. This is true. But if the State sues in this court, instead of the Circuit Court, it does so by its own choice. And if the remedy at law in the forum selected is embarrassing and expensive, it has no right to complain of what is the necessary consequence of its own act; nor to go into equity to avoid difficulties at law, which arise from the nature of the forum to which the State voluntarily resorts; and certainly no inconvenience to the court could alter the law, nor give it equity jurisdiction where the law has denied it. In the language of the act of Congress, Pennsylvania has in this case a plain and adequate remedy at law, and has no right, therefore, to come to the equity jurisdiction of the court, until her legal right has been established.
Indeed this case, in my view of it, pushes the jurisdiction of chancery further than has heretofore been done in England or in this country.
The bridge has been erected and completed without any previous injunction to restrain the respondents from proceeding in the work. It is charged to be a public nuisance. But Pennsylvania has no right to proceed against it solely on that account. She proceeds, and is entitled to proceed, only for the private and particular injury to her property which this public nuisance has occasioned. If the court order it to be demolished, it is not to protect the public or any portion of the community who may be supposed to be injured by it. For the government, which represents the public, and is charged with its interests, is not before the court; and has not complained of this structure, nor sought to have it removed. Pennsylvania is the only party asking for relief; and her damage, as proved in the record, is a trivial loss of some few dollars in tolls; and the mere possibility of an annual future loss to some small amount, concerning which the testimony is vague and inconclusive, and at best but conjectural. She has no concern with the obstruction to boats with high chimneys, nor with the amount of trade from Pittsburg, or any other place, further than such evidence tends to show the bridge to be a public nuisance. The owners of steamboats, and the persons engaged in commerce are not parties to this suit, and the State of Pennsylvania has no right to prosecute for them. She must not only show that boats with high chimneys are more profitable to the owners, and better for commerce, than those with lower, ones, but she must also show that the necessity of reducing them will lessen the profits of her canals. I see no proof in the record by any means sufficient to establish that fact. And we are called upon to demolish a structure which cost more than $200,000 to save the State of *590 Pennsylvania from this speculative, questionable, and at most, inconsiderable loss. It seems to me that if the power and jurisdiction of this court were clear, and supported by precedents, yet, this court, upon settled principles of equity jurisprudence, would refuse to destroy property of so much value, and which the public, by its proper officer, does not charge to be a nuisance, merely to guard against the possibility of an inconsiderable loss by the State. It is precisely one of those cases in which the court would, at all events, require the party to establish his right at law before he comes into equity, or to make the attorney-general a party, and give the public an opportunity of being heard where its interest is so deeply involved.
I do not doubt the power of the Court of Chancery to abate a public nuisance, upon an information in chancery, to which the attorney-general is a party. But even in a case of that kind there must be danger of irreparable mischief before the tardiness of the law can reach it. This is the doctrine of this court in the case of the City of Georgetown v. The Alexandria Canal Company, 12 Pet. 98. But such a case is not now before us. The attorney-general is not a party. Pennsylvania sues as an individual for a private right. And in a case of this description I am not aware of any case entitled to be regarded as an authority in this court, where chancery ever interfered by injunction except by way of prevention, that is, to stay the contemplated structure, until it could be decided, in a proceeding to which the public was a party, whether it was a public nuisance or not. We must be careful not to confound cases of public nuisance with merely private ones. For, in the former, the public have an interest to abate it if a nuisance, and to protect it, if it is not, and therefore have a right to be heard, whether the trial be in equity or at law.
This was evidently the opinion of this court in the case of the City of Georgetown v. The Alexandria Canal Company, and of Lord Eldon, in the case of Crowder v. Tinkler, 19 Ves. 616, therein cited, with approbation. In the last-mentioned case, where the court interfered for prevention, and not to abate a structure already completed, the chancellor placed the injunction upon the ground that the nuisance about to be erected would be attended with extreme probability of irreparable injury to the property of the plaintiffs, including also danger to their existence. And that this was clearly established in that case before he awarded the injunction. Such is the rule upon this subject which has been sanctioned by this court. Certainly no one of the material circumstances which existed in Crowder v. Tinkler, can be found in this. And if the principles decided here in the case of the City of Georgetown v. The Alexandria Canal Company, *591 are recognized as the law of this court, I can see no foundation for the injunction in the case before us. For it not only has none of the circumstances in it, upon which the injunction was granted in Crowder v. Tinkler, but in that case, strongly as it appealed to the preventive power of the Court of Chancery, the court merely suspended the erection until the question of public nuisance or not could be tried by a jury upon an indictment. It did not grant a perpetual injunction, and still less did it order what had already been constructed to be abated or removed.
So far I have considered the case upon the assumption that the bridge, upon common-law principles, might, upon the evidence, be determined to be a nuisance. And, admitting that to be the case, I think, for the reasons above stated, that in the absence of any legislation upon the subject by Congress, this proceeding cannot be maintained. I shall, therefore, very briefly express my opinion on the evidence.
I am by no means prepared to say, that this bridge would be a public nuisance even at common law. The evidence of the degree in which it obstructs navigation is exceedingly voluminous, and it is impossible to go fully into an examination of its comparative weight, in a manner that would do justice to the subject, without making this opinion itself a volume. It is sufficient to say, that in all questions of this kind, the general convenience and interest of the public in the travel and trade across the river, as well as on its waters, must be taken into consideration. For whether it is a public nuisance or not, depends upon whether it is or is not injurious to the public. The cases in the State Courts, and in the Circuit Courts of the United States, referred to in the argument, which I shall not stop here to examine, in my opinion maintain this doctrine. And upon principle, independently of adjudications, it cannot be otherwise. A structure which promotes the convenience of the public, cannot be a nuisance to it. And the public, whose interests are to be looked to in this case, is not the public of any particular town or district of country, or State or States, but the great public of the whole Union. Taking this view of the question, and looking to the testimony as set forth in the record, and more especially to that unerring test, experience, which the lapse of time has afforded, I am convinced that the detriment and inconvenience to the commerce and travel on the river, is small and occasional only, while the advantages which the public derives from the passage over, are great and constant. And if the courts of the United States had common-law jurisdiction, and the question was legally before us to determine whether this bridge was a public nuisance or not, I am of opinion that it is not; and that *592 the advantages which the great body of the people of the United States reap from it, outweigh the disadvantages and inconvenience sustained by the commerce and navigation of the river.
Moreover, the jurisdiction exercised in this case, is new and without precedent in this court. Bridges have been erected over many navigable rivers, and built so near the water, that vessels can pass only through a draw. Such bridges are unquestionably obstructions, and impede navigation. For where the vessels are propelled by sails, and the wind is unfavorable, they are often detained not only for hours, but for days. The courts of the United States have never exercised jurisdiction over any of these obstructions, nor declared them to be nuisances. I should be unwilling, in a case like this, to exercise this high and delicate power without precedents to support me in analogous cases. The demolition of this bridge would occasion a heavy loss to the parties, and much inconvenience to a large portion of the community. The United States are not parties to this proceeding, and the particular injury sustained by the complainant is exceedingly small. And it is solely for the protection of her small, remote, contingent, and speculative interest in tolls, that this bridge is pulled down. For it must be remembered that, although we see in the testimony that injuries are alleged to have been suffered by others, yet the State of Pennsylvania is the only party to this proceeding, the only one who appears in this court as complainant, and her particular loss is the only ground on which jurisdiction is claimed, and the only injury which the court is called on to redress; or has a right to consider in this proceeding.
The testimony, too, is conflicting; men of eminence and skill, and well qualified to speak on the subject, differing widely in their testimony. And I am the more unwilling to assume this questionable jurisdiction, because the legislative department of the general government has undoubted power over the whole subject, and may regulate the height of bridges over the Ohio, and of the chimneys of steamboats when passing under them, and may, while it guards the rights of navigation in the stream, at the same time protect the rights of passage and travel over it. That department of the government has better means, too, of obtaining information, than the narrow scope of judicial proceedings can afford. It may adopt regulations by which courts of justice may be guided in an inquiry like this with some degree of certainty, instead of leaving them to the undefined discretion which must now be exercised in every case that may be brought before us, without being able to lay down any certain rule, by which this discretion may be limited. It is too near the confines of legislation; and I think the court ought not to assume it.
*593 Entertaining this opinion, I must, with all the respect I feel for the judgment of my brethren, with whom it is my misfortune to differ, enter my dissent.
Mr. Justice DANIEL dissenting.
In entering upon the consideration of the case before us, the mind is at once impressed with the belief that there never has been, that there perhaps never can be brought before this tribunal, for its decision, a case of higher importance or of deeper interest than the present. The subjects which it presses upon our examination, nay, upon which the judgment of this court has been demanded, and has inevitably determined, are nothing less than 
1st. The jurisdiction or authority of this court, under one of the heads of Original Jurisdiction, enumerated in the Constitution.
2d. The correct interpretation of the power of commercial regulation vested in the federal government, either exerted simply as such by that government, or as affecting the power of internal improvement in the States.
3d. The policy or influence of particular regulations with respect to commerce, as these may tend to restrict it within circumscribed channels, or to promote its general activity and diffusion, by facilities operating a reasonable and just equality of right, of competition, and advantage to all.
4th. The character of the proceeding complained of as a nuisance, the regularity of the proposed mode of redress, and the right of the complainant to claim the interference asked for in any mode.
The magnitude of these topics would seem, in some degree to excuse, in treating them, the hazard of prolixity, and at any rate, lying as they do in the direct path to the proper survey of this case, they cannot with propriety be overstepped, without pausing upon their examination.
When, at a former period, this cause was before this court, the several topics just enumerated were cursorily adverted to by me as necessarily involved in its adjudication; and the course then adopted by the court was formally objected to, because that course seemed a premature and foregone conclusion upon facts and legal positions entering essentially into the nature of the controversy; facts and legal positions not then maturely examined and ascertained, as the order of the court at that time made, necessarily implies; and which could not, according to established precedent, and the highest adjudications, be properly investigated in the mode proposed. The subsequent proceedings upon the order of the court at the January term, 1850, have *594 greatly strengthened the objections assigned by me on that occasion. These proceedings have, at an almost incalculable expense to the parties, brought hither an immense mass of matter, much of which on the one hand is not within the inquiries directed by the court, whilst on the other, inquiries strictly pertinent seem to have been wholly excluded. It has placed before us a long and very learned report, to be sure, in part upon subjects entirely dehors the order of the court, and in other aspects of the same report, (I speak it with all respect for the highly intelligent and respectable author of that report,) palpably opposed, in my opinion, to the rational and just preponderance of the facts stated by the witnesses; a report, in fine, which leaves in all its weight and force, the mischief of withdrawing the trial of the question of nuisance from its proper forum, in which the witnesses could have been confronted and cross-examined; and imposes upon the court the task of passing upon the credibility of those whom they have never heard nor seen. Even in matters of minor concernment, I have always been unwilling, whenever the credibility of witnesses was to be tested, to interpose between such persons and the scrutiny of a jury, awakened, as it is sure to be, by the vigilance of the advocate; where the essential rights and interests of great communities are at stake, I never will do so, unless constrained by irresistible authority.
Recurring now to the first head of inquiry, I contend that the complainant can have no standing here, on the ground that this court cannot, as is shown, both upon the face of the pleadings and upon the proofs, take jurisdiction of this cause. If this court can take cognizance of the cause before us, it must be in virtue of the 2d section of the 3d article of the Constitution, which declares that "in all cases affecting ambassadors, other public ministers and consuls, and those in which a State shall be a party, the Supreme Court shall have original jurisdiction." There is no other provision of the Constitution under which original cognizance of this cause by the Supreme Court can be assumed. Now, to arrive at the just interpretation of this clause of the Constitution, as fixing that position or interest of the State as a party, which alone creates original jurisdiction in the Supreme Court, it is necessary to settle the import of the word party, as connected with legal or equitable proceedings. By all correct legal intendment, this term party is applicable only to persons sustaining a direct or real interest or right in any pending litigation; an interest or right immediately affected or bound by the issues such litigation involves. This term cannot be extended to persons who may be arbitrarily and irregularly named in proceedings either at law or in equity, the very description of whose relation to the case shall evince a total absence of legal or equitable *595 claims upon the subject of litigation; a total absence, too, of reciprocal duty or obligation with reference to those whose property and whose possession and enjoyment of that property, are sought to be affected. Whilst courts of justice, therefore, will enforce the conventing of all whose interest can properly be adjudged, they will repel and even rebuke attempts to assail, or even to canvass, the rights and interests of others, by those who in effect concede the want of a legal or equitable title in themselves. Courts of justice take no cognizance of imperfect rights, or such as may be termed merely moral or incidental, as distinguishable from legal or equitable, even when the existence of the former may be clearly shown. In this controversy, the State of Pennsylvania, admitted to have no property in or title to the River Ohio within the limits of Virginia, and no property in or title to the steamboats which ply upon that river, is confessedly made use of as a mean, under the shelter of her name, of redressing grievances, which, if they ever had existence, are injuries to her citizens and to individuals, and the proper and efficient remedy for which is to be found at the suit of those citizens in the courts of the State or of the United States. The alleged right of Pennsylvania to sue in this case, for a diminution of profits from her canals and other works of internal improvement within her own territory, and many miles remote from the Wheeling Bridge, had it not been cast into shade by a still greater extravagance disclosed by the record, (her right of ship navigation with top-gallant royals all standing,) might have awakened some surprise; but even this tamer and less lofty pretension should fail of the end it has been designed to effect, for it cannot be pretended, and is not even intimated in the pleadings in this cause, that those canals and other public works have been obstructed or rendered in any respect less fitted for transportation, or in any way impaired by the erection of the Wheeling Bridge beyond her territory, and within that of a separate and independent State. And if the mere rivalry of works of internal improvement in other States, by holding out the temptation of greater despatch, greater safety, or any other inducement to preference for those works over the Pennsylvania canals, be a wrong, and a ground for jurisdiction here, the argument and the rule sought to be deduced therefrom should operate equally. The State of Virginia, who is constructing a railroad from the seaboard to the Ohio River at Point Pleasant, much farther down that river than either Pittsburg or Wheeling, and at the cost of the longest tunnel in the world, piercing the base of the Blue Ridge Mountain, should have the right by original suit in this court against the canal companies of Pennsylvania, or against that State herself, to recover compensation for diverting any portion of the *596 commerce which might seek the ocean by this shortest transit to the mouths of her canals on the Ohio, or to the city of Pittsburg; and on the like principle, the State of Pennsylvania has a just cause of action against the Baltimore & Ohio Railroad, for intercepting at Wheeling, the commerce which might otherwise be constrained to seek the city of Pittsburg. The State of Pennsylvania cannot be a party to this suit on the grounds stated in the bills filed in her name, for the reason, still more cogent than any yet assigned, viz. that to permit this, would be to render the clause in the Constitution, relied on in her behalf, utterly useless, and even ridiculous; would destroy every restriction intended by the enumeration of instances of original jurisdiction; and would confound this clause with another provision of the Constitution, designed to cover cases precisely like the one now before the court. If in all instances in which the citizens of one State have cause of action against a citizen or a corporation of a different State, the action can be prosecuted in the name of the State in which the claimant resides, although no peculiar or legal right or cause of action can be shown in such State sustaining the character of a private suitor, then the restriction as to cases of original jurisdiction is entirely abolished; the defending party, too, must be entitled to the same right of substitution, and all suits between citizens of different States might, by this process, be transformed into suits between States, or suits to which States are parties; cases of original jurisdiction in this court. That provision of the Constitution designed to embrace controversies between citizens of different States is thus annulled, and the jurisdiction of the District and Circuit Courts transferred, as falling within its original cognizance, to the Supreme Court. Such, to my apprehension, appears to be the inevitable result of asserting what are essentially and clearly private rights or interests, in the name of a State, or the prosecution of remote, contingent, and imperfect interests not amounting to property, though claimed on behalf of a State. I conclude, therefore, that to constitute a State a party in that sense which brings her within the meaning of the Constitution, and indeed within the import of the term party to a cause by all correct legal intendment, there must be averred and proved on her behalf, a certain and direct interest, or an injury, or a right of property  a perfect right  a right which a court of justice can define, adjudge, and enforce; and that on the part of the State of Pennsylvania no such right having been averred even, much less established in proof, nothing is shown which can maintain the jurisdiction of this court in this cause. The shadowy pretext of an interest or injury, from the nature of things not susceptible of calculation or estimate, can never be the *597 foundation of a right, legal or equitable. And, indeed, so far as any light can be reflected by facts on this pretended or incidental interest of Pennsylvania, resulting from any supposed effect upon the tolls on her canals, an actual increase instead of a diminution of those tolls since the erection of the Wheeling Bridge, is proved.
Passing from this subject of jurisdiction, and supposing it for the present to be vested here, I proceed to examine the pretensions of the complainant, as being deducible from, and as guaranteed by, the power delegated to Congress to regulate commerce between the several States. The existence of that power, in its fullest extent, and for every purpose for which it has been delegated to Congress, need not be questioned, in order to expose and to repel the pretensions advanced for the complainant. On the contrary, the assertion of that power in its greatest latitude, so far as it was ever contemplated by those who gave it, or so far as it can be exercised for useful purposes, carries with it necessarily, the condemnation of those pretensions. The power to regulate commerce was given to the federal government, whose functions and objects were designed to be general and coextensive with the entire confederacy, because its duties embrace the equal rights and interests of all the members of the confederacy, and as a mean of the widest diffusion of commercial facilities and intercourse within the powers vested by the Constitution. It cannot be rationally concluded that, by a provision palpably intended to protect commerce from unequal or invidious restrictions, the power was given to Congress to advance so far towards restriction or monopoly as to limit commerce to particular channels; thereby crippling or wholly preventing its diffusion and activity, and, by the same process, conferring upon particular points or sections of the country, arbitrary and unjust advantages, and riveting, upon all those portions affected by such a procedure, loss and even ruin. Admitting, then, that Congress had made any regulation affecting the subjects of this controversy, (and it will hereafter be shown that they have not done so,) admitting, moreover, that their acts or regulations might fall within the broad language of the power vested by the Constitution, it remains still a just and fair inquiry, whether those acts which are arbitrary or oppressive, which defeat the great ends for which the power, thus perverted, may have been within the legitimate scope of the powers alleged in excuse for their performance. In other words, whether Congress, as a regulation of commerce, would be justifiable in breaking down works of internal improvement within the States, though calculated in their character and tendencies for the diffusion of commerce, and by such destruction limit commerce to particular local points or *598 interests? Common sense and common justice would promptly answer in the negative, and would decide that a rational and proper, nay, the only rational and proper, exercise of the regulating power in Congress, demands the promotion and protection of such modes and facilities of commercial intercourse, (so far as Congress have this power,) as will insure equality to all, and the widest diffusion of commercial advantage. Surely, then, in the absence of all action on the part of Congress, this court should imply no policy or design in that body to fetter or cripple great interests which they are charged with the power and duty to protect. But Congress have enacted no regulation whatever in relation to the subject of this controversy; they have not said that bridges should nowhere be erected over the River Ohio, or, if erected, what should be their elevation above the water; neither have they declared, upon scientific calculations or upon experiments, or on any data, what shall be the height of the chimneys of steamboats on that river, nor to what degrees, either from their own calculations of improvement in speed, or from fancy or local rivalry, the owners or masters of steamboats on that river may elongate the chimneys of those steamboats. Upon all these matters Congress have thus far been perfectly silent.
Admitting, then, that the State of Pennsylvania can be regularly before us in the character of a party in interest, this controversy presents to us, in truth, simply a comparison between the will and the acts of the parties thereto, and an appeal to this court, in the absence of all action by Congress,  by some rule which it must deduce from the common law of nuisance, to decide upon the comparative merits or demerits of the parties,  to decide whether the benefits produced by the Wheeling Bridge to the surrounding country, and by its connection with extended lines of travel and commerce, can save it from the character of a nuisance. Or whether its interference, in certain stages of water, with the chimneys of seven steamboats, owned by private individuals, the height of whose chimneys is a subject of much contrariety of opinion, both amongst scientific men and practical builders and captains of steamboats,  can so constitute it a public nuisance, and a cause of such direct injury to the legal rights and interests of Pennsylvania, as to justify its abatement by this court. In the absence of all action by Congress in relation to this matter, in the only legitimate mode in which Congress could affect it, viz., by commercial regulation, or by some express statutory declaration, the act of one of these parties in the prosecution of their interests must claim intrinsically equal authority with the acts of the other, except so far as they may have some common arbiter by whom both may be controlled. In this case, that arbiter would seem to be either the local sovereignty, *599 (the State of Virginia,) within whose territory the alleged nuisance is situated, or the United States, through some enactment for the regulation of commerce; but neither of these authorities is invoked in this controversy. We have here a suit in the name of Pennsylvania, occupying the position of every private suitor, asking the action of this court upon general common-law jurisdiction over the subject of nuisances, which jurisdiction the courts of the United States do not possess. Nor is it enough to draw within our cognizance the subject of this cause, to affirm merely the competency of Congress to legislate upon it, and to refer its decision, if they choose, to the federal courts. I ask upon what foundation the courts of the United States, limited and circumscribed as they are by the Constitution, and by the laws which have created them and defined their jurisdiction, can, upon any speculations of public policy, assume to themselves the authority and functions of the legislative department of the government, alone clothed with those functions by the Constitution and laws, and undertake, of their mere will, to supply the omissions of that department? Is it either in the language or theory of the Constitution, that this court shall exercise such an auxiliary or rather guardian and paramount authority? Cannot the legislative department of the government be intrusted with the fulfilment of its peculiar duties? Such an act as this court has been called upon to perform; such an act as it has just announced as its own, is, in my opinion, virtually an act of legislation, or, in stricter propriety, (I say it not in an offensive sense,) an act of usurpation. To rest our authority to adjudicate this matter on the naked proposition just stated, would be to reject the doctrine by this court heretofore most expressly ruled. The case of Wilson v. The Blackbird Marsh Creek Company, (2 Peters, 245,) seems to be conclusive upon this point. This case presented an instance of an absolute obstruction by a dam of a watercourse navigable by vessels of considerable size, and in which the tide ebbed and flowed. The person who undertook to destroy or injure the dam constructed across this navigable water, was the master of a vessel regularly licensed and enrolled according to the navigation laws of the United States; and being sued for a trespass committed in breaking or injuring the dam, he pleaded, in justification of his act, the character of the navigable water as a public and common highway, for all the citizens of the particular State, and of the United States, to sail, pass, and repass over, through and upon, at all times of the year, at their own free will and pleasure. Upon comparing this case with the one before us, it is impossible not to perceive that in many of their capital features they are strikingly similar  may, indeed, be regarded as identical. In the *600 former case, as in this, the watercourse said to be obstructed was a navigable water; in that case, as in this, the locus in quo was within the jurisdiction of a State, and the alleged obstruction, in each instance, an act of State legislation in exercising the power of internal improvement; in each instance, the right of passage to the extent and in the manner claimed, freely and at will usque ad clum, was in virtue solely of license and enrolment, according to the navigation laws of the United States. Now, what said this court upon the aforegoing state of the pleadings and evidence? "If Congress," said they, "had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control State legislation, over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the middle and southern States, we should feel not much difficulty in saying, that a State law, coming in conflict with such act, would be void. But Congress has passed no such act. The repugnancy of the State law to the Constitution, is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power which has not been so exercised as to affect the question. We do not think that the act empowering the Blackbird Marsh Creek Company to place a dam across the creek, can, under the circumstances of the case, be repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject." This decision at once puts to flight the pretext for interference here to protect and enforce the duties and functions of Congress, and equally exposes the fallacy that the grant of a coasting license, of a mere certificate of the domicil of the vessel bearing it, of evidence primâ facie, of her capacity or tonnage, or of her exemption from suspicion of smuggling or piracy, is a regulation of commerce over every inch of the waters over which, in her various excursions, she may pass. Just as cogent and tenable is the argument, if argument it deserves to be called, which affirms that the establishment of Pittsburg as a port of entry, its mere designation as a point at which merchandise may be landed subjeet to the revenue laws of the United States, is a positive declaration by Congress, prescribing the modes of the transportation of such merchandise thither, and defining what shall be held to be an interference with such transportation. Equally, or rather more unsound and untrue, is the position that, by the same designation of Pittsburg, Congress have declared that vessels propelled by wind or steam, vessels of the greatest capacity, carrying masts or chimneys of illimitable height, shall navigate a river whose ordinary regimen, to adopt a term in this record, scarcely affords a channel broad or deep *601 enough for the tacking of a shallop, and for long periods of a few inches only in depth. This attempt, from the mere designation of a port of entry, to bring home to Congress the absurdities the argument implies, would ascribe to them a practical wisdom much upon a parallel with that of the despot who attempted to confine the Hellespont in fetters, or of him who forbade the approach to him of the ocean-tide. But Congress have in truth enacted nothing in relation to the particular subject in issue in this controversy; and we have seen, in the explicit declaration of this court, in the case from 2 Peters, that not only must there be some positive enactment by Congress, but an enactment "the object of which was to control State legislation over those navigable creeks into which the tide flows." But again: it has been asserted, in justification of the power claimed by the majority of the court, that Congress, by adopting the act of the Virginia Legislature, of December 18th, 1789, authorizing the erection of Kentucky into a State, have fully regulated the navigation of the Ohio River. And how is this position sustained by fact? By the 7th section of her act of 1789, Virginia declares that, so far as her own territory and that of the proposed State shall extend upon the Ohio, the navigation of that river shall be free for all the citizens of the United States. Congress, by an act passed February 4th, 1791, containing two sections only, (vide 1 Stat. at Large, 189,) consents, by the 1st section, to the proffer of Virginia of the creation of the new State; and, by the 2d section, declares, that on the 1st day of June following, the new State, by the name of Kentucky, shall be admitted a member of the Union. These two sections comprise the entire action of Congress, from which the position that has been asserted by the majority of the court is deduced. Let us try the integrity of this position by reducing it to the form of a syllogism. The major of that syllogism will consist of the fact, that Virginia, by her law of 1789, has agreed that she and the newly proposed State will permit the navigation of the Ohio within their respective limits, to all citizens of the United States. Its minor is this,  that Congress have assented to the permission so declared; the conclusion attempted to be deduced is, ergo Congress by that assent have completely regulated the navigation of the Ohio, and by inevitable implication ordained that bridges shall never be thrown across that river, except in absolute subordination to the interests or the will of the owners of steamboats upon that river. This may possibly be logic, irrefragable logic; and the failure to comprehend its consistency may arise from the infirmity of my own perceptions; but I cannot help suspecting, that an acumen, far surpassing any to which I will lay claim, would be puzzled to reconcile this process *602 with the laws of induction, as prescribed by Watts, by Duncan, or by Kaims.
The next inquiry, naturally arising in this case, an inquiry inseparably connected with the alleged obstruction by the Wheeling Bridge, as constituting it a nuisance or otherwise, an inquiry equal in magnitude of interest with any other involved, relates to the policy and effects of commercial regulations, as these may tend either to the restriction of commerce within particular channels, or to supplying auxiliaries for its prosecution, or for the promotion of its activity and diffusion by increased facilities, operating a just equality of right and competition and advantage to all. And here it may be premised, that throughout the discussion of this cause, a reigning fallacy has been assumed and urged upon the court, a fallacy, which, if successful, may subserve the grasping pretensions of the plaintiff, but which, by an enlightened view of this case, must be condemned as destructive to the extended commercial prosperity of the country. The error assumed as the basis of the plaintiff's pretensions is this, that commerce can be prosecuted with advantage to the country, only by the channels of rivers, and in all the country intersected by the western rivers, only through the agency of steamboats; and hence is attempted the deduction in favor of the paramount privileges of steamboats, and the right claimed for this species of commercial vehicles for exemption from any limit upon the interests or the fancies of those who may own or manage them. It has been a curious and somewhat amusing incident, in the argument of this cause, that whenever any restraint upon the management of steamboats (on the Ohio) was intimated, (as necessary for the protection of other essential rights, both public and private,) the fixed reply of the advocate in opposition has been, that commerce demands these peculiar privileges in the owners and masters of steamboats. An obvious and stricter propriety of argument would have suggested for that reply the following language: Steamboat proprietors, local monopoly, and the peculiar views of interest, real or imaginary, of the plaintiff, supply the true origin and character of the pretensions here urged; commerce, enlightened, extended, fair, equal, prosperous, and beneficial, condemns all such pretensions; she demands that freedom, fairness, competition, and equality, which are the true, and only true causes of her prosperity; and which the equalizing power vested by the Constitution, was designed to insure.
Commerce, in its infancy, is of necessity chiefly confined to the channels of watercourses. Weakness, poverty, or the absence of art or science, are unable, in the earlier stages of society, to supply more eligible or efficient modes for its prosecution, or to overcome the difficulties attendant on transportation off the *603 water. Hence we see the rude essays of commerce commencing with the raft, the canoe, or the bateau; but, as wealth and population, science and art advance, we trace her operations to the magnificent ship or steamboat; each adapted to its proper theatre. Does not this very progress, and the advantages which are their concomitants, glaringly expose the folly and injustice of all attempts at the restriction of commerce to particular localities, or to particular interests, or means of circulation? Are her operations to be confined to a passage up and down the channels of watercourses, impracticable for navigation for protracted periods, and whose capacity is always dependent on the contributions of the clouds, aviditas cli aut nimius imber? Would not such a narrow policy be a proclamation to commerce, inhibiting her advancement; and to the hundreds of thousands situated without her permitted track, that the wealth, the luxuries, and comforts of civilization and improvement, if to be enjoyed by them at all, are to be obtained only at far greater expense and labor, and in an inferior degree, than they are enjoyed by more favored classes? These positions are strikingly illustrated by the experience of our own times, and indeed of a very brief space. Thus, notwithstanding the high improvement in navigation by steam and by sails, which seems to have carried it to its greatest perfection, we see the railroad in situations where no deficiency of water and no artificial or natural obstruction to vessels exist, or are complained of, stretching its parallel course with the track of the vessel, tying together as it were, in close contiguity, and connecting, in habit and sympathy and interest, remote sections of our extended country, which, for any aid that the navigation on our rivers could afford, must ever remain morally and physically remote. The obvious superiority of the railroad, from its unequalled speed, its greater safety, its exemption from dependence upon wind or on depth of water, but above all, its power of linking together the distant and extended regions interposed between the rivers of the country, spaces which navigation never can approach, must give it a decided preference, in many respects, to every other commercial facility, and cause it to penetrate, longitudinally and latitudinally, longe et late, the entire surface of the country, unless arrested in its progress by the fiat of this court; for, once let it be proclaimed that the rivers of this country shall, under no circumstances of advantage to the country, be spanned by bridges, at the trivial inconvenience and cost of adapting to their elevation the chimneys of a few steamboats, even if the height of those chimneys had been clearly shown to be necessary, or certainly advantageous, (a problem nowhere solved in this record); let this, I say, be proclaimed, and the effect above mentioned is *604 at once accomplished; the rapidly increasing and beneficial system of railroad communication is broken up, and a system of narrow local monopoly and inequality sustained. Whether these things shall now be done; whether, for these purposes, the citizens of this country shall be restrained in their social and business relations, and so restrained under the abused and perverted name of commerce,  are the questions which this court have been called on to decide, and which, in my view, they have affirmatively ruled. They are questions too grave, too pregnant with vital consequences, to have been decided upon the speculations of any one man living.
It was with the view, doubtless, of giving plausibility to the conclusion of the commissioner, or to the strange idea sought to be enforced in the argument for the complainant, that commerce signified only a passage up and down the Ohio, that so large a portion of the commissioner's report is taken up in treating, in learned phrase, of the dynamic and static capabilities of the Wheeling Bridge; or, translated into plain English, the capability of that bridge to sustain heavy bodies in motion and at rest. It does not seem very easy to reconcile this part of the report with the order appointing the commissioner, and prescribing his duties. That order directed the commissioner to ascertain and report whether the Wheeling Bridge was, in his opinion, an obstruction to commerce upon the Ohio; and in the event that he should so regard it, to suggest any alterations by which such obstruction might be remedied. The dynamic or static capabilities of the bridge, introduced to our notice with some parade of learning, whether it could support any weight, either in motion or at rest, were subjects altogether dehors the order of this court, and without the warrant and powers of the commissioner. And this difficulty is in no degree lessened by the fact, disclosed in the record, that whilst the commissioner wandered beyond his commission to pronounce upon the capabilities of the bridge for railroad transit, he rejected all the evidence, tendered by the defendants, to prove the usefulness and importance of the bridge, either to the local population or as a public and commercial facility. This irregularity in the commissioner is of no small significance, as it betrays a bias on his part, however honest, which led him to throw the weight of his opinion against the usefulness of the bridge; a fact entering essentially into its character, as being a nuisance or otherwise, and to withhold from this court evidence by which the value of his opinion might have been tested with precision. This same irregularity should have had its effect in warning this court to scrutinize the opinions of the commissioner on matters falling regularly within the scope of his commission. The evidence received, *605 and that rejected on this particular point, were, perhaps, both inadmissible under the terms of the order of this court; but surely it should have been either wholly admitted or rejected on both sides.
And this brings me to the last branch of inquiry, which I have proposed to treat, namely  The character of the erection complained of; the regularity of the mode of redress proposed, and the right of the complainant to claim the interference asked for in any mode. First, then, can the Wheeling Bridge, according to any correct acceptation of the term, be regarded as a nuisance? This inquiry is answered by the solution of another, which is simply this: is that bridge injurious to the rights and interests of the public, or of individuals, beyond the benefits that its erection confers on both? Common sense and consistency assure us, that to pronounce that to be a wrong and an injury which is in reality beneficial, involves a plain absurdity; and the language of legal definition fully sustains this conclusion of common sense; for, according to such definition, there must be the hurt, the nocumentum, the commune nocumentum, the injury to the public right, to constitute it a public nuisance; for, admitting the fact of injury by any act, still if, in its origin, character, and extent, it is essentially private, it may be trespass or some other form of injury, but not the public offence of nuisance. This position implies no denial of the right to show a private injury resulting from a public nuisance; it insists only upon the necessity of showing where special or private injury is alleged as flowing from a nuisance, that nuisance in reality exists. This forces back upon us the inquiries into the nature of the offence of nuisance; and when ascertained, against what public authority it has been committed? I have said, that upon the plainest principles of common sense, no act in reference to the public, by which a public benefit is conferred, can be denominated a nuisance; and I insist that the rules and conclusions of the law are in accordance with this proposition. These are forcibly stated in the case of the King v. Russell, 6 Barn. & Cress., particularly by Bayley, J., beginning at page 593 of the volume. That was the case of an indictment for a nuisance by the erection, in the River Tyne, of a peculiar wharf or staging, called giers or staiths, for the purpose of loading coal on board ships in the Newcastle trade. The questions before the King's Bench arose upon the charge of Bayley, J., who tried the case at nisi prius, where his charge concluded in the following terms: "Thus, gentlemen, I apprehend I have pointed out to you the true ground on which your verdict is to be founded. If you think this (that is the wharf or staith,) is placed not on a reasonable part of the river, that it does an unnecessary damage to *606 the navigation, or that this is not of any public benefit, or that the public benefit resulting from it is not equal to the public inconvenience arising from it, then you will find a verdict for the crown; if on these points you are of a different opinion, then for the defendants." This charge of Sir John Bayley was sustained in bank. The reasoning in support of that charge by that able judge, is given more at length than can be conveniently inserted here; but it presents a commentary upon this question so lucid, so entirely conclusive, that I cannot forbear to extract a portion of it, as illustrating, much better than I have power to do, the doctrines for which I contend. "I submitted," says Sir John Bayley, (page 594,) "to the consideration of the jury, that if, by means of these staiths, an article of great public use found its way to the public at a lower price, and in a better state than it otherwise would, I thought these were circumstances of public benefit, and points they might take into their consideration upon that head; and upon the best attention that I have been able to give the subject, I am bound to say I continue of that opinion. The right of the public upon the waters of a port or navigable river is not confined to the purposes of passage; trade and commerce are the chief objects, and the right of passage is chiefly subservient thereto. Unless there are facilities for loading and unloading of shipping and landing, much of the public benefit of a port is lost. In the infancy of a port, when it is first applied to the purposes of trade and commerce, unless the water by the shore be deep, the articles must be shipped in shallow water from the shore, and landed in shallow water on the shore. Breakage, and pilferage, and waste, besides the expense of boating, are some of the concomitants of such a mode. As trade advances, the inconvenience and mischief of this mode are superseded by the erection of wharves and quays, and what is perhaps an improved species of loading wharf, a staith. But upon what principle can the erection of a wharf or staith be supported? It narrows the right of passage. It occupies a space where boats before had navigated. It turns part of the waterway into solid ground; but it advances some of the purposes of a port, its trade and commerce. Is there any other legal principle upon which they can be allowed? Make an erection for pleasure, for whim, for caprice, and if it interfere in the least degree with the public right of passage, it is a nuisance. Erect it for the purposes of trade and commerce, and keep it applied to the purposes of trade and commerce, and subject to the guards with which this case was presented to the jury, the interests of commerce give it protection, and it is a justifiable erection, and not a nuisance." In accordance with this doctrine, has the law been propounded by the Supreme Court of New York, in the case of the People v. *607 The Rensselaer and Saratoga Railroad Company, reported in the 15th of Wendell, page 113. That was a prosecution against the company for placing abutments and piers in the bed of the Hudson River, and erecting a bridge across it, being a public navigable river. In delivering the opinion of the court, the law of the case is thus stated by Savage, Chief Justice, pp. 132, 133, of the volume above mentioned. "I think I may safely say, that the power exists somewhere to erect bridges over waters which are navigable, if the wants of society require them, provided such bridges do not essentially injure the navigation of the waters they cross. Such power certainly did exist in the State legislatures before the delegation of power to the federal government by the federal Constitution. It is not pretended that such a power has been delegated to the general government, or is conveyed under the power to regulate commerce and navigation; it remains then in the State legislatures, or it exists nowhere. It does exist, because it has not been surrendered any further than such surrender may be qualifiedly implied, that is, the power to erect bridges over navigable streams must be so far surrendered as may be necessary for a free navigation upon those streams. By a free navigation must not be understood a navigation free from such partial obstacles and impediments as the best interests of society may render necessary."
In conformity with the doctrines above quoted, and in support of the views here contended for, I might confidently appeal to the language of the judge, by whom the decision of this court has just been announced, on another occasion most explicitly and emphatically declared. Thus, in the case of Palmer v. The Commissioners of Cayuga County, which was an application for an injunction to prevent the construction of a draw-bridge over the Cayuga River, upon the ground that it would obstruct the navigation of the river, that judge, in refusing the application, announces the following, as I conceive, unanswerable conclusions: "A toll charged for the improvement of the navigation, would not be a tax for the use of the river in its natural state, but for the increased commercial facilities. A draw-bridge across a navigable water is not an obstruction. As this would not be a work connected with the navigation of the river, no toll, it is supposed, could be charged for the passage of boats. But the obstruction would be only momentary, to raise the draw; and as such a work may be very important in the general intercourse of the community, no doubt is entertained, as to the power of the State to make the bridge. It is one of those general powers possessed by a State, for the public convenience, and may be exercised, provided it does not infringe upon the federal powers." These positions require no comment *608 from me; they commend themselves by their obvious propriety and reasonableness. I would simply remark, in connection with these positions, and as warranted by them, that any obstruction by the Wheeling Bridge is of course contingent and not certain; that even were it certain, under the present elevation of the bridge, this difficulty might be prevented at a comparatively small expense and inconvenience by lowering, when necessary, the chimneys of a few steamboats for the purpose of safe and speedy passage; that this operation, like the raising of a draw, would be only momentary; and as, to use the language of the judge, the Wheeling Bridge "may be a work of great importance in a general intercourse, no doubt, is entertained, as to the power of the State to make the bridge." It will be admitted, I presume, that the Ohio can claim no higher privileges than those appertaining to other navigable rivers.
It follows, then, from these adjudications, not less than from the principles of common sense, that the conclusion, nuisance or no nuisance, is dependent solely upon the character of the act complained of as being noxious or beneficial to the public, and that the ascertainment of that character, where it is doubtful upon the circumstances, or where it is positively denied, is regularly an investigation of fact to be made and settled, except under circumstances of peculiar urgency, by the established proceeding of the common law in relation to all questions of fact, a trial by jury. This is the doctrine of Lord Hale in reference to this very subject of obstructions in navigable waters, as quoted from his Treatise De Portubus, where it is said by that venerable judge, "the case of building into the water where ships or vessels might formerly have ridden, whether it be nuisance or not nuisance, is a question of fact." I will not here deny, nor is it necessary in any view to deny, that a court of equity will prevent by injunction the creation of a private injury in the nature of a nuisance, or the continuation of such an injury in a case proper for its jurisdiction. Thus, where an individual or private person is about to perform an act, or has performed an act which is palpably and notoriously in its character a nuisance, from which private and irreparable injury will ensue to others, or has accrued to others, and will continue, a court of equity, upon the admitted or notorious character of the act from which the private injury is shown to proceed, and from the irreparable character of that injury, will interpose by injunction to relieve the party injured. Such is the principle ruled by Lord Eldon, in the case of the Attorney-General v. Cleaver, 18 Vesey, 211, which was upon an information by private persons for private injury, though in the name of the attorney-general; and by the same judge in the case of Crowder v. Tinkler, in the *609 19 Vesey, 616. Such, also, I understand to be the rule laid down by this court in the case of the city of Georgetown v. The Alexandria Canal Company. These cases all proceed upon the grounds of the ascertained character of the act complained of on the one hand, and of the private and irreparable nature of the injury shown on the other. This is as far, it is believed, as the courts of equity have ever proceeded. They have never said, that where the act complained of was dubious in its character, as being a nuisance, or otherwise, and where that fact was a matter of contestation, they would assume jurisdiction a priori, or without sending the question of nuisance to be tried at law, but have ruled the reverse of this; and in the cases just quoted from Vesey, Lord Eldon declared that he would not decide those cases until the equivocal or contested fact was settled at law. Again, it is ruled in the cases above quoted, and in many others which might be adduced, that although the courts of equity will, in order to prevent irreparable private injury, interpose by way of injunction, that where the abatement of a public nuisance is the purpose in view, as that is an offence against the government, the attorney-general must be a party to any proceeding for such a purpose. In this case the act complained of, if a nuisance, is a public nuisance, and is so denominated upon the record, and by the decision of the majority. Its character, however, as a nuisance in any sense is denied; and much testimony has been taken by both parties upon this contested question. The interests of Pennsylvania, who stands here in the relation of a private suitor, and the alleged injury to her private interests, are the sole foundation on which she has sought here the abatement of what she has asserted to be a public nuisance. And without the participation of any representative of the sovereignty either of the State or the federal government, without the agency of the attorney-general of the State, or of the United States, without the reference to a jury of any of the contested facts of this case, this court, in the professed exercise of original equity jurisdiction, upon affidavits, and upon the opinion of a single individual, who has been, by this court, constituted the arbiter of all questions of public policy, of law, of science, and of art, and of the competency and credibility of all the testimony in the case, have decided upon the act complained of with reference to its influence upon the rights and powers both of the United States and of the local sovereignty; upon the rights and interests of the complainant in the matter in controversy, and upon the extent of the injury, if any, done to those interests. They have, upon the same grounds, and in the like absence of the legal representative of either the State or federal sovereignity, directed a great public work, disapproved by neither of *610 those sovereignties, and by one of them expressly authorized and approved, to be, in effect, demolished.
I do not deem it necessary, if it were practicable, to examine here, in detail, the cumbrous mass of statement and speculation heaped together on this record. Such a task is not requisite in order to test the accuracy of the decision pronounced in this case, or to sustain the objections to which that decision is believed to be palpably obnoxious; both these objects appear to me to be attained by regarding the character of the case as described by the plaintiff herself, and the nature and manner of the proceeding adopted by the court as a remedy for the case so presented. I will give, succinctly, however, the results to which, in my view, the court should have been led by the facts of the case, and to which an industrious examination, at least, of the testimony, has conducted my mind. Before this, however, I must be permitted to point out a striking inconsistency between the alleged ground of jurisdiction in this cause, as set forth in the pleadings, and the conclusion to which the court has been carried, and the reasons they have assigned for their conclusion. It will be remembered, that the ground of jurisdiction insisted upon in this case, is the injury alleged to have been done to the State of Pennsylvania, as a private suitor  her peculiar interest alone and none other  for none other could give jurisdiction to this court under the Constitution; yet nothing is more obvious, than that the whole argument of the court is founded upon the injury inflicted by the bridge upon the owners of certain steam-packets, and upon the trade of Pittsburg. Calculations are gone into, at length, to show what number of passengers and what amount of freight are carried by these particular packets; how much they would lose by being deprived of this business, or by being subjected to the inconvenience and cost of lowering their chimneys, and how much the business of Pittsburg would be injured by the obstruction complained of. Thus the true character of this causé is betrayed in the very argument and conclusions of the court. The name and alleged interests of Pennsylvania, as a private suitor, are used to draw to this court jurisdiction of this cause; but no sooner is that jurisdiction allowed in the name of Pennsylvania, than she, and any peculiar or corporate interests she was said to possess, are at once lost sight of, and those of the steamboat owners, and the local interests of Pittsburg alone are enforced.
The results, above alluded to, are as follows: 1st. That the conflicting opinions of those who have been called, as men of science, to testify in this cause, establish nothing conclusively, much less ascertain the theory contended for, that, for purposes *611 of economy, of rapid combustion of fuel, or for the generation and escape of steam, an extraordinary height of chimney is necessary; but leave it doubtful whether the elongation of chimneys beyond a certain altitude is not calculated to retard the escape of heated air and smoke, and also to cause inconvenience and danger to the boats that carry them. 2d. That, amongst the practical men, consisting of those who have experience in constructing boats, and boilers, and other steamboat machinery, and also in commanding steamboats on the western rivers and elsewhere, the preponderance, for several reasons mentioned by them, is against the extraordinary height of chimneys. 3d. That the cost incident to such a construction of chimneys, (supposing this great altitude to be advantageous,) as to admit of their being lowered, and the delay and hazard of lowering them, are subjects of minor import; have been greatly exaggerated in the statements of some of the witnesses, and should not be weighed in competition with an important public improvement, itself a valuable and necessary commercial facility, and cannot convert such a work into a public nuisance, or, in any correct sense, an obstruction to navigation. 4th. That the commissioner erred in yielding to speculation and theory, rather than to practical knowledge and experience, and to the statements of witnesses, in some instances, whose local position was calculated, though it may have been honestly and unconsciously, to influence their feelings and their judgments. With regard to the right of the plaintiff to ask the abatement of the Wheeling Bridge, as a nuisance, by any mode of proceeding, I will here add another remark, which has in some degree been anticipated in preceding views in this opinion; and it is this: A nuisance, to exist at all, and emphatically a public nuisance, must be an offence against the public, or more properly against the government or sovereignty within whose jurisdiction it is committed. In the case before us, that sovereignty and that jurisdiction reside either in the commonwealth of Virginia, or in the federal government. If in the former, she has expressly sanctioned the act complained of; consequently, no nuisance has been committed with respect to her. If the sovereignty and jurisdiction be in the United States, it is a limited and delegated sovereignty, to be exerted in the modes and to the extent which the delegating power has prescribed. There can be no other in the government of the United States,  none resulting from the principles of the common law, as inherent in an original and perfect sovereignty. There then can be no nuisance with respect to the United States, except what Congress shall, in the exercise of some constitutional power, declare to be such; and Congress have not declared an act like that here complained of to be a *612 nuisance. Upon the whole case, then, believing that Pennsylvania cannot maintain this suit, as a party, by any just interpretation of the 2d section of the 3d article of the Constitution, vesting this court with original jurisdiction: Believing that the power which the majority of the court have assumed cannot, in this case, be correctly derived to them from the competency of Congress to regulate commerce between the several States: Believing that the question of nuisance or no nuisance is intrinsically a question of fact, which, when contested, ought to be tried at law upon the circumstances of each case, and that, before the ascertainment of that fact, a court of equity cannot take cognizance either for enjoining or abating an act alleged, but not proven, to be nuisance: Seeing that the commonwealth of Virginia, within whose territory and jurisdiction the Wheeling Bridge has been erected, has authorized and approved the erection of that bridge; and the United States, under the pretext of whose authority this suit has been instituted, have by no act of theirs forbidden its erection, and do not now claim to have it abated;  my opinion, upon the best lights I have been able to bring to this case, is, that the bill of the complainant should be dismissed. From these convictions, and from the sense I entertain of the almost incalculable importance of the decision of the majority of the court in this case, I find myself constrained solemnly to dissent from that decision.

Motion for another Reference.
On the above opinion being pronounced, and the two dissenting opinions, Mr. Johnson, of counsel for defendants, suggested to the court, that the engineer of the bridge had informed him that the obstruction to the navigation of the Ohio might be avoided by making a draw in the suspension-bridge, or in some other manner, far less expensive to the Bridge Company, and equally convenient to the public, than by elevating the bridge, as required in the opinion.
On this suggestion, the court observed that, as they were desirous of having the obstruction removed in a manner that shall be most convenient and least expensive to the Bridge Company, they requested the counsel to file, in writing, his suggestions, and give notice to the other side, that both parties may be heard in regard to them.
In pursuance of the above suggestion from the court, the counsel for the Bridge Company filed their suggestions in writing, and an argument took place. Afterwards, Mr. Justice McLEAN delivered the following opinion of the court.

*613 Order of Reference.
In pursuance of the intimation of the court, the counsel for the defendants filed, in writing, five plans for the removal of the obstruction to navigation occasioned by the bridge.
1. To elevate it, as required by the opinion of the court.
2. To remove the wooden bridge over the western channel of the river.
3. To remove the flooring of the suspension-bridge, so that the tallest chimneys may pass under the cables.
4. To construct a draw in the wooden bridge over the western channel.
5. To make a draw in the suspension-bridge.
It is objected by the complainant's counsel that, after a case has been argued upon the evidence, and the opinion of the court pronounced, it is not within any known rules of chancery proceeding to hear additional evidence, with the view of modifying, in any respect, the decree. That some of the plans now proposed were not embraced by the pleadings or evidence in the case, and that the effect must be to open the case for additional evidence and a new argument.
The bill alleged the bridge to be an obstruction to the navigation of the Ohio, and prayed that it might be abated as a nuisance. The answer denied that it was an obstruction to navigation.
The commissioner was directed to inquire, "if an obstruction be made to appear, what change or alteration in the construction and existing condition of the said bridge, if any, can be made, consistent with the continuance of the same across said river, that will remove the obstruction to the free navigation."
In the opinion of the court, the bridge is an obstruction to the navigation of the river, and they held that an elevation of it one hundred and eleven feet from low-water mark, the width of three hundred feet across the channel of the river, would remove the obstruction. Except the elevation of the bridge, no mode was proposed by the commissioner, for the removal of the obstruction. His instructions limited him to a "change or alteration in the bridge," which should effectuate that object. Several of the plans now proposed, were not within the scope of his inquiry, and of course were not embraced by his report.
In giving relief, the court are not bound to abate the nuisance, as prayed for in the bill, nor to adopt the report of the commissioner, if the obstruction can be removed and the public right maintained with less expense to the bridge company. This is a matter within the judgment of the court, and does not necessarily constitute a part of the pleadings.
*614 It is suggested that the elevation of the bridge, as required in the opinion of the court, must result in its abatement, as the stockholders have not the pecuniary means of elevating it. Whatever may be the consequences to the stockholders, a great public right cannot be made subservient to their interests. Subject to that right, the court will regard and protect their interests.
The second plan, which proposed to remove the bridge over the western channel of the river, we shall refer to the engineer who acted under the commissioner, and who is familiar with all the facts, and having his surveys before him, can give promptly to the court the information they desire.
To remove the flooring of the bridge, as proposed in the third plan, leaving the cables in their present position, seems to have no other practical result than the sale of the cables.
The third and fourth plans propose to construct a draw for the passage of boats, in the suspension or the western bridge.
Draws are common in bridges across arms of the sea where the tide ebbs and flows, for the passage of sea vessels, and also in bridges over rivers with a sluggish current; but we entertain great doubts whether a draw in either of the bridges, as proposed, can be constructed so as to afford "a convenient and safe passage" for the steamboats that ply upon the Ohio. Some of them are about two hundred and fifty feet long, and from fifty to sixty feet in width. The current in the Ohio, at high water, is from five to six miles an hour. A steamboat, to be under the command of the helm, must have a pressure of steam, which, with the current, would give it a considerable velocity in passing the draw, and any deviation from the direct line by the wind, the eddies and currents of the river, in high water, might throw the boat against the bridge on either side. This might be fatal to the boat and to the lives of its passengers; and the danger would be greatly increased by attempting to pass the draw at night, especially when the weather is unfavorable to navigation.
Jonathan Knight, an engineer called by the defendants, before the commissioner, said, "my opinion is, decidedly, it would be better to pass under, (the bridge) by lowering chimneys, than to have a draw; that it would be less dangerous and take less time." And he further states, "where there is a draw, the space is necessarily contracted, and it might strike on the one side or the other, or the wind might be adverse."
The report of the commissioner contains a report of Charles Ellet, "on a railway suspension-bridge across the Connecticut (River) at Middletown," in which he says, "the flooring (of the bridge) is to be placed one hundred and forty feet above the river, and the navigation left entirely unobstructed." And he recommends "a high level to avoid" "the injury to the public consequent *615 on delays at the draw." In the same report he observes, "no party would now be so idle as to ask to place a draw-bridge across the Ohio or Mississippi; no law could be obtained for such an obstruction, and nothing is hazarded by the assertion that such a nuisance would be immediately overthrown, if placed there under the color of any law. The bridges that are established on those streams, must be placed high enough to clear the steamboats, and must leave the channel open."
We shall direct the decree drawn up in pursuance of the opinion of the court, which affords to the stockholders of the bridge the alternative of elevating it, and thereby removing the obstruction to the navigation of the river, to be filed but not recorded, until the engineer or the commissioner shall report upon the second, third, fourth, and fifth plans proposed by defendants' counsel. Notwithstanding the above intimations in regard to a draw, we are desirous of having the report of a practical and scientific engineer on that subject, as well as in relation to the other plans.
It is therefore ordered, that the clerk of this court transmit to William J. McAlpine, Esquire, a copy of this opinion, with a request that he make a report to this court, on or before the second Monday of May next, 
1st. Whether a draw can be constructed in the suspension-bridge, that shall afford a safe and convenient passage for the largest class of steamboats which ply to Pittsburg, having chimneys eighty feet high, at a depth of water thirty feet from the ground, and if such a draw be practicable, that he give a particular description in what manner and of what dimensions it must be constructed.
2d. Whether such a draw may be constructed in the wooden bridge over the western channel of the river.
3d. Whether the removal of the western bridge will open an unobstructed channel for the packets which now pass Wheeling, having chimneys eighty feet high, at all times when they shall not be able to pass under the suspension-bridge.
4th. Whether the removal of the flooring of the bridge, as proposed, will enable packets to pass having chimneys eighty feet high.
In obedience to this order of the court, Mr. McAlpine filed the following report.
To the honorable Roger B. Taney, chief justice; John McLean, James M. Wayne, John Catron, John McKinley, Peter V. Daniel, Samuel Nelson, Robert C. Grier, and Benjamin R. Curtis, associate justices of the Supreme Court of the United States.
In pursuance of the order of the Supreme Court of the United *616 States, dated the first day of March, 1852, a copy of which has been furnished by the clerk of the said court, dated the third day of March, 1852, I, William J. McAlpine, do make the following report on the several matters directed in the said order, as follows:
1st. Whether a draw can be constructed in the suspension-bridge that shall afford a safe and convenient passage for the largest class of steamboats which ply to Pittsburg, having chimneys eighty feet high, at a depth of water thirty feet from the ground; and if such a draw be practicable, that he give a particular description in what manner, and of what dimensions, it must be constructed.
2d. Whether such a draw may be constructed in the wooden bridge over the western channel of the river.
3d. Whether the removal of the western bridge will open an unobstructed channel for the packets which now pass Wheeling, having chimneys eighty feet high, at all times, when they shall not be able to pass under the suspension-bridge.
4th. Whether the removal of the flooring of the bridge, as proposed, will enable packets to pass having chimneys eighty feet high.
The largest class of steamboats which ply to Pittsburg are the daily packets, which are from fifty-four to fifty-eight feet in width, and from two hundred and fifteen to two hundred and sixty-four feet in length.
In a direct channel, with a moderate current, and in favorable weather, a draw of one hundred feet in width would, with skilful navigation, be sufficient for the safe and convenient passage of such vessels.
In the high stages of water in the Ohio River at Wheeling, the velocity of the current is from five to six miles an hour. A steamboat, in passing down the river, must have an additional velocity to keep her under the command of the helm, so that she must pass the draw with a velocity of from eight to ten miles per hour; and this speed would be less than the ordinary velocity of the vessel in other parts of the river.
In stormy weather, with the wind blowing across the current of the river, it would be difficult for a steamboat, of the size above stated, to pass without considerably more allowance than would be provided for in a draw of one hundred feet in width.
At such times, the danger of passing the draw at night would be much increased, and it would be necessary to maintain lights on each side of the draw to guide the pilots in the proper direction to pass it.
Under the ordinary circumstances of high water, a draw of at least one hundred and fifty feet in width would be necessary, *617 and one of two hundred feet in width to pass at night with safety.
In dark, stormy nights, and with a rapid current in the river, the hazard of a passage would be so great that vessels would probably be laid by, rather than risk the dangers of the passage of a draw of less than three hundred feet in width.
From the accompanying drawing of the present suspension-bridge at Wheeling, it will be seen that a draw cannot be placed in the eastern end of the bridge which will give a clear passage-way, beneath the cables, for steamboats having chimneys eighty feet high, at a depth of water thirty feet above the ground, of one hundred feet in width.
At the western end of the bridge, adjoining the western abutment, a draw may be placed, which will give a passage for such vessels in a thirty feet stage of water, of nearly one hundred feet in width:
In reply, therefore, to the first question of the court, I have to state, that a draw of sufficient width for the safe and convenient passage of steamboats of the dimensions stated, cannot be constructed in the present bridge.
In a five feet stage of water, such a vessel would have a space of ninety-six feet in width, adjoining the eastern shore, to pass beneath the flooring of the present bridge, and in a six feet stage a width of one hundred and twelve feet.
At any stage of water higher than six feet, the width of passage would be reduced in consequence of the steep inclination of the eastern bank of the river.
In a five feet stage of water, vessels drawing four feet would strike the bed of the river on the western shore, at a point eight hundred and eighty feet from the face of the eastern abutment.
A steamboat with a chimney eighty feet high would, (allowing two feet for clearance,) on a five feet stage of water, in extremely warm weather, clear the cable at a point six hundred and seventy-one feet from the face of the eastern abutment, which leaves a clear passage-way of two hundred and nine feet in width.
In a six feet stage of water, the vessel would strike the bed of the river at nine hundred feet, and the chimney would clear at six hundred and eighty-five feet; which leaves a clear passage of two hundred and fifteen feet in width.
In a seven feet stage of water, the vessel would strike the bed at nine hundred and eighteen feet, and the chimney would clear at six hundred and ninety-seven feet, leaving a passage-way of two hundred and twenty-one feet in width.
In an eight feet stage of water, the vessel would strike the bed *618 of the river at nine hundred and twenty-two feet, and the chimney would clear at seven hundred and nine feet, leaving a passage of two hundred and thirteen feet.
In a nine feet stage of water, the vessel would strike the bed of the river at nine hundred and twenty-six feet, and the chimney would clear at seven hundred and nineteen feet, leaving a passage of two hundred and seven feet.
In a ten feet stage of water, the vessel would strike the bed of the river at nine hundred and thirty feet, and the chimney would clear at seven hundred and twenty-nine feet, leaving a passage of two hundred and one feet.
In an eleven feet stage of water, the vessel would strike the bed of the river at nine hundred and thirty-four feet, and the chimney would clear at seven hundred and thirty-nine feet, leaving a passage of one hundred and ninety-five feet.
In a twelve feet stage of water, the vessel would strike the bed of the river at nine hundred and thirty-eight feet, and the chimney would clear at seven hundred and forty-nine feet, leaving a passage of one hundred and eighty-nine feet.
In a thirteen feet stage of water, the vessel would strike the bed of the river at nine hundred and forty-two feet, and the chimney would clear at seven hundred and fifty-nine feet, leaving a passage of one hundred and eighty-three feet.
From the accompanying chart, it will be seen that the shoal which makes into the river from the west shore above the bridge, would render it difficult for a vessel to enter the draw on a six feet stage of water, unless its eastern end were located at least three hundred feet from the western abutment, and then the passage-way under the bridge, clear of the bottom of the river and cable, would be two hundred and fifteen feet in width.
It is necessary that the draw should be arranged for this stage of water, because a vessel could not then pass under the flooring of the eastern end of the bridge, with a sufficient width of clear space.
For each foot that the water rises, the passage-way is thrown about ten feet to the west, and its width is diminished about six feet.
In an eighteen feet stage of water, the chimney would clear the cables at a point seven hundred and eighty-three feet from the face of the eastern abutment, which would leave a clear space of one hundred and ninety-three feet in width.
In a thirty feet stage, the chimney would clear at eight hundred and sixty-six feet, leaving a space of one hundred and ten feet.
The draw would, therefore, require to be made at least three hundred feet long, from the face of the western abutment, to *619 allow the passage of steamboats of the dimensions stated, in the several stages of water, from six to thirty feet in depth.
It is, in my opinion, impracticable to construct so large a draw in a suspension-bridge, because from its flexible character, and the constant change of position of its cables, which would be caused by the movement of a mass of so great weight as the draw, it would not admit of the adaptation of machinery for its movement.
A draw of this length might be constructed in the Wheeling Suspension-Bridge, by erecting a pier in the river at the eastern end of the draw, and carrying the cables over the top of it, in the manner suggested by Colonel Long, in his testimony before the commissioner, and suspending the draw from a strong permanent bridge, elevated on the top of the new pier and abutment of the present bridge, similar to the tubular bridges recently constructed across the Conway and Menai straits, in Great Britain. The cost of constructing such a draw, and of the necessary alterations of the bridge, would exceed the cost of elevating it to the height stated in the order of the court.
The inconvenience of the approach to a draw placed in this position, and the uncertainty of its successful operation and maintenance under all circumstances of weather, exposed to winds, and with its machinery liable to be deranged by frost, or by the accidental encounter with passing vessels, render the utility of the plan, in my opinion, so doubtful, that any further detail of its arrangement is deemed unnecessary.
A draw can be constructed in the wooden bridge over the western channel of the river, which will, under ordinary circumstances, offer a safe and convenient passage for the largest class of steamboats which ply to Pittsburg. This bridge consists of three spans, each of two hundred feet in length. A drawing is herewith sent, which exhibits a plan of a draw placed in the centre span of the bridge, which opens a clear space of two hundred feet.
The plan of this draw is similar to one which has been constructed on the London and Brighton railroad, which has a single draw, moving in one direction, of sixty-six feet in length.
The plan proposed for the Wheeling Bridge, is in two parts, opening in the centre, and moving back on the floor of the present bridge. Each draw will open one hundred feet, (being thirty-four feet more than the single draw above mentioned,) and making the whole opening two hundred feet, equal to the space between the centre piers.
The plan proposed will require the removal of the roof, and the centre trusses of the end spans of the present bridge, to allow the draws to move back on the floors. The draws to be *620 timber; truss frames, each two hundred feet long, the ends supported by timber suspenders from the top of a well-braced centre frame; the land ends of the draws to be loaded sufficiently to balance the projecting portion of the same. When the draws are closed, the ends are to be secured together with iron pins passing through iron straps, and the land ends fastened to the end spans of the permanent bridge in a similar manner. When the bridge is thus closed and secured, it will form a perfect suspension-bridge of two hundred feet span.
The draws will be moved on wheels moving on iron rails, laid on the floor of the end spans, which will require to be strengthened by additional timbers. The trusses should also be strengthened with arch ribs and timbers to support the additional weight of the draws.
The draws to be moved by gearing placed in the piers, working into a rack on the underside of the draw-bridge frame; the gearings moved by a capstan placed on the side of the bridge over the piers. The capstan may be worked by man or horse power.
The floor of the draw will be two and a half feet above the floor of the permanent bridge, which may be overcome by a light platform attached to the end of the draw, that would move with the draw when opening or closing.
The cost of removing the centre span of the permanent bridge, strengthening the side or end spans, and constructing the draw-bridge, is estimated at thirty-three thousand and twenty-three dollars and sixty cents, ($33,023.60.)
It is proper that I should state that there would be some difficulty experienced in the opening of this, or any other practicable draw, during very strong gales of wind, and at such times some delays would unavoidably occur in the passage of vessels.
The present bridge over the western channel would not admit of the construction of a draw of more than two hundred feet in width, without the expenditure of a sum nearly as great as that required for the construction of a new bridge.
A draw of three hundred feet in width may be constructed, either in the present bridge, or in a new bridge over the western channel, in the same manner as before stated, at the western end of the suspension-bridge.
The expense of the construction of such a draw would exceed the cost of elevating the suspension-bridge to the height stated in the order of the court, and there would be the same difficulties in operating and maintaining it as have been before stated.
In my opinion, no draw can be constructed in either of the bridges at Wheeling, which would produce no delay, and present *621 no obstruction to the safe and convenient passage, at all times, of the largest class of steamboats which navigate the Ohio River at Wheeling.
In reply to the third question of the court, I have to state, that the removal of the western bridge will open an unobstructed channel for the packets which now pass Wheeling, when the water is six feet deep on the Wheeling bar.
It has been previously stated that steamboats, with chimneys eighty feet high, will have a passage-way under the flooring of the suspension-bridge of ninety-six feet in width in a five feet stage of water, and of one hundred and twelve feet in a six feet stage.
By removing the obstructions in the western channel, which are now caused by a bar at the north end of Zane's Island, an unobstructed channel can be obtained for such vessels at all times when they cannot pass under the suspension-bridge.
A chart is herewith sent, which exhibits the obstructions of the western channel.
In reply to the fourth question of the court, it is proper to state, that from the preceding report it will be seen that the removal of the flooring of the suspension-bridge will enable packets to pass under the cables, having chimneys eighty feet high, the clear width of the passage being, as before stated, from one hundred ten to two hundred and twenty-one feet in width, depending upon the stage of water in the river.
The naked cables would afford no guide to direct the passage of vessels to the point at which the chimneys would clear the cables on the one side, and not strike the bottom of the river on the other side.
It would be necessary to suspend lights on the cables during the night to indicate the passage.
In high stages of the water, and during the night, the passage of vessels of the size stated would be attended with difficulty and danger, in consequence of the narrowness of the space, and of its being out of the main channel of the river. Respectfully snbmitted,
 WILLIAM J. McALPINE.
 Albany, May 8, 1852.
This report was made the subject of another argument, in consequence of exceptions to it being filed by Mr. Campbell, the Attorney-General of Pennsylvania, and Mr. Stanton, also of counsel for the complainant. The report of the case has already been extended to such an unusual length, that the reporter cannot find room to notice the arguments of the respective counsel upon the exceptions.
*622 Mr. Justice McLEAN delivered the opinion of the court.
The plans lately proposed, through defendant's counsel, to obviate the obstructions to the navigation of the Ohio River, by reason of the Wheeling Bridge, complained of by the plaintiff, having been referred to William J. McAlpine, Esquire, civil engineer, he reports 
That a draw cannot be made in the suspension-bridge which shall afford a safe and convenient passage for the largest class of steamboats, which ply from Pittsburg, having chimneys eighty feet high, on a depth of water thirty feet from the ground. And he reports that a draw can be constructed in the wooden bridge over the western channel of the river, which will, under ordinary circumstances, offer a safe and convenient passage for such boats.
That bridge, he states, consists of three spans, each of two hundred feet in length; and he proposes that the draw shall be placed in the centre span of the bridge, which will open a clear space of two hundred feet. He also reports, in answer to the third question of the court, "that the removal of the Western Bridge will open an obstructed channel for the packets which now pass Wheeling, when the water is six feet deep on the Wheeling bar."
On this report the parties have been heard.
The counsel for the defendants complain that no notice was given to them, of the late action of the engineer. A notice was unnecessary. The proposed plans were submitted by the defendants, and they were referred to the engineer, who acted under the commissioner; and who, having made the surveys and reports, was in possession of all the evidence necessary to give the required information to the court. He had only to look into his own work for the data to make the additional report in regard to both bridges and the two channels of the river, over which they have been constructed. His opinion as to a draw and the other matters referred to him, were strictly within the line of his profession. No act done under the late reference was open for investigation by proof, or subject to be influenced by argument. The presence of the parties by their counsel was neither necessary nor desirable, and notice to the defendant was not, therefore, required to be given.
By the reference the court did not intend to make the opinion of the engineer the immediate basis of a final decree. They were desirous of ascertaining all the facts which could have a bearing in the decision of the case. They were fully impressed with its high importance to the public and to the defendants. And, whilst a high sense of duty required them to maintain the public right, they were solicitous, as expressed in their former opinion, to do so, with the least possible expense to the defendants.
*623 In their former opinion nothing was said, from which an inference could be drawn, that the right of crossing the Ohio River by bridges, was incompatible with its navigation. Had this bridge been constructed, in the language of its charter, so "as not to obstruct the navigation of the Ohio in the usual manner, by steamboats and other crafts, as are now commonly accustomed to navigate the same, when the river shall be as high as the highest floods hereinbefore known," this suit could never have been instituted. The charter was granted in 1847, long after the great floods in 1832, and in subsequent years.
The right of navigating the Ohio River, or any other river in our country, does not necessarily conflict with the right of bridging it. But these rights can only be maintained when they are so exercised as not to be incompatible with each other. It is in their improper exercise, and not in their nature, that any incompatibility exists.
We can derive but little instruction on this subject, from European experience and practice. The rivers on that continent are generally diminutive, and of no very great length. They do not compare with the great rivers of the West. The bridges on the Rhine are numerous, and most, if not all of them, have draws, through which boats are continually passing. But their boats are small, with low and light chimneys, and some, if not many of the bridges, rest upon the surface of the water. A boat of two hundred and ninety-five feet in length, as the Pittsburg, it is believed, is not to be found engaged in inland river navigation in Europe.
The report now before us, in its outlines, is not objected to by the defendants. On the contrary, they ask the court to sanction it, leaving open its details. In their former opinion, after stating the elevation which must be given to the suspension-bridge to remove the obstruction, the court say, "if this, or some other plan, shall not be adopted, which shall relieve the navigation from obstruction, on or before the first day of February next, the bridge must be abated." It was supposed that some plan might be suggested to remove the obstruction, at less expense than the elevation or abatement of the bridge. The court had before them only the general plan for relief reported by the commissioner. Under such circumstances, they felt themselves bound to receive and refer the propositions submitted by the defendants' counsel. The affirmative action on these propositions belong to the defendants; and also the eventual responsibility.
The court think that the report of the engineer, in its general aspect, without examining its details, affords such probability of success as to entitle the defendants to the proposed experiment. *624 We look to the desired results, and not to the practicability and efficiency of the plan. Of these the defendants must judge. They have the means of ascertaining, with the utmost accuracy, whether a channel can be opened, in the western branch of the river, so as to afford a safe and an unobstructed navigation for the largest class of boats, having chimneys eighty feet high, when they cannot pass under the suspension-bridge. This is the object desired, and any thing short of this would not be satisfactory.
When the subject of a draw was first suggested to the court, it was intimated that no draw was known which exceeded seventy feet in width, but it was supposed that one of eighty feet might be constructed. And the court then said, "we entertain great doubts whether a draw in either of the bridges, as proposed, can be constructed so as to afford a convenient passage for the steamboats that ply upon the Ohio River." A draw of two hundred feet in the clear is now proposed, and one less than that, would not answer the public demand.
The court will not now examine, whether there be not in the western channel other obstructions than the bridge. If such obstruction exist, of whatsoever nature, they must be known to the defendants, and must be removed.
With these general remarks, the court will leave the defendants free in the matter, to act as their own judgments shall dictate.
The elevation of the bridge, in pursuance of the report of the commissioner, was ordered by the court, as the best mode of removing the obstruction, suggested by the evidence. The abatement of the nuisance was the most direct and ordinary mode for giving relief in such cases. The alternative of elevating the bridge was adopted, from considerations connected with the interests of the defendants, and the accommodation of the public. The same views have influenced us, in relation to the proposition now before us. We do not sanction them farther than to leave them to the defendants, to work out and secure, if they shall think proper, the required results, as stated in this opinion. The inconsiderable delay of two or three minutes in passing the draw, and running the increased distance of the western channel, does not constitute a material objection. From the statement made the increase of time would be less than is ordinarily consumed in the landing or receiving a passenger at the shore.
The objection, that the navigation of the eastern channel of the river has been improved by the government, and that the plaintiff has a right to its unobstructed use, is admitted to have much force.
*625 In the multitudinous concerns of commerce, we must view things practically, and cannot deal in abstractions. It is not always in the discretion of a court to measure justice by doing or requiring to be done the exact thing which would seem to be most appropriate. Cases may arise in which great interests are involved, that may have had their origin in wrongful acts, yet connected with circumstances which render it extremely difficult, if not impracticable, to do the thing, or cause it to be done, which is most fit and proper. In such cases, as in the law of mechanics, equivalents are of necessity substituted. And if the thing done be all that justice can require, it may suffice. Such, is not unfrequently the necessary action of a court of chancery.
If the western channel of the river shall be made to afford an equally safe and unobstructed passage for boats, as the eastern channel, before the structure of the suspension-bridge, excepting the mere passage of the draw, and the increased distance, no appreciable injury is done to commerce.
The court will direct the decree which has been filed, and which required the bridge to be elevated, as therein specified, on or before the first day of February next to be recorded, and that it shall stand as the order of this court, unless before that time the western channel of the river shall be made by the defendants, to afford an unobstructed passage to boats of the largest class which ply to Pittsburg, agreeably to this opinion; and leave is given to either party to move the court in relation to this matter, on the first Monday of February next.
The costs of this suit are ordered to be paid by the defendants.

Decree.
This cause having been heard in February last, and the opinion of the court pronounced; on the suggestions of the defendants' counsel a reference on certain points was made to William J. McAlpine, whose report having been made and arguments heard from the counsel on both sides at the adjourned term, in May, 1852, the cause stands for a final decree, on the original bill, the amendments thereto, the answers of respondents, and replications to said answers; and on the proofs in the cause, together with the report of the commissioner appointed by this court to examine the premises, and on the exceptions to said report:  when it appeared  that the respondents, in the year 1849, had erected a suspension-bridge supported by iron-wire cables across that portion of the River Ohio lying between the city of Wheeling and Zane's Island, by virtue of a charter granted by the commonwealth of Virginia, the span of said bridge being over one thousand feet long; and it also appeared that across the *626 other channel of the river west of Zane's Island, there is a truss-bridge so constructed as altogether to prevent the passage of steamboats through that channel, which bridge is owned and maintained by the defendants. And it further appeared that the suspension-bridge over the channel of the river east of the island, is so near the flow of the water in its ordinary stages, as seriously to hinder and obstruct the largest class of steamboats from passing and repassing under said bridge, in going to and returning from the port of Pittsburg, in the State of Pennsylvania; that large and expensive public improvements made by, and the property of, that State, consisting of canals connecting railroads, turnpike-roads, and slack-water navigation in said State, constructed years before the said suspension-bridge was erected, all of which improvements terminate at Pittsburg, on the Ohio River, and extend throughout the State of Pennsylvania, to the east and north, connecting the city of Philadelphia, in said State, and Lake Erie with the River Ohio. That a large commerce for several years has been and now is carried on over these public works of internal improvement, on which Pennsylvania levies reasonable tolls to maintain said works, and to compensate her for their erection. That said bridge imposes serious obstructions to the largest class of vessels propelled by steam, and which bring freight and passengers from below said bridge, and which freight and passengers are intended to pass east and north over the canals and railroads of Pennsylvania, or to be conveyed down the Ohio River, having been transported on the public works of Pennsylvania, a portion of which commerce has been hindered and prevented, and hereafter must be hindered and prevented from passing over the public works of that State, because of obstructions to navigation interposed by said bridge. That the said Ohio River is a navigable stream, the navigation whereof by law is free to all citizens of the United States, and ought to remain unobstructed; and that the said suspension-bridge not only obstructs and hinders navigation on said river but by means of such obstructions does occasion a special damage to the said State of Pennsylvania as aforesaid, for which there is not a plain and an adequate remedy at law, but on the contrary thereof, such injury is irreparable by an action or actions at common law.
It is, therefore, decreed and adjudged, that said suspension-bridge is an obstruction and nuisance, and that the complainant has a just and legal right to have the navigation of the said river made free, either by the abatement or elevation of the bridge, so that it will cease to be an obstruction, in ordinary stages of high water, to the largest class of steam-vessels now navigating the Ohio River, and which alteration is hereby declared *627 to be an elevation of said suspension-bridge, to the height of one hundred and eleven feet at least, in its undermost parts, above the low-water mark, by the Wheeling gauge of the Ohio's water; and that the height of said one hundred and eleven feet shall be maintained to the extent of three hundred feet on a level headway over the channel of the said river. And that, from the respective ends of said headway, of three hundred feet, to the abutments of each end of the bridge, the descent shall not exceed at the rate of four feet fall to every hundred feet of extension on the line of the bridge; and that the same shall be removed by respondents, or altered, as above stated, on or before the first day of February, 1853.
Since the above decree was drawn, certain propositions having been made by the defendants to open an unobstructed navigation for boats of the largest class, which ply to Pittsburg, through the western channel of the river, as is more particularly stated in the last opinion of the court in this case, which may avoid the obstructions by reason of the bridge complained of by the plaintiffs; and, as time has been given, to the first Monday of February next, for the defendants, should they deem proper, to carry out their propositions, by removing all obstructions in the western channel, on which day the plaintiff may move the court on the subject of the decree, and of the proposed alterations in the western channel, which, being before the court, will enable them to act in the premises as the law and the equity of the case may require.
The court order the costs to be paid by defendants.
Mr. Chief Justice TANEY and Mr. Justice DANIEL dissented.
Opinion of Mr. Justice Daniel and Mr. Chief Justice Taney.
When this case was formerly before us, my opinion was expressed at length against the right of this court to take jurisdiction thereof. My opinion upon this question remains unchanged; but the court having taken jurisdiction, I do not conceive that my objection to the cognizance by the court of this controversy forbids my concurrence in any modification of the decree originally proposed in this case, calculated to relieve the defendants from the operation of exactions, believed by me to be unwarranted by law. I therefore concur in the proposed modification of the former decree, by which a draw is authorized in the bridge over the western branch of the River Ohio. I think, however, that the length prescribed by this court for the draw is greater than the public exigencies require, and *628 that a draw of one hundred feet, at the utmost, would be ample to meet those exigencies. It is also my opinion, that the costs in this cause should be equally borne by the parties.
Mr. Chief Justice TANEY also dissented, concurring in the opinion of Mr. Justice Daniel.